1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                            ---oOo---

4   SEAN O'TOOLE, KELLEY O'TOOLE,     )
    STEVEN DANIEL LEE, JENNIFER LYNN )
5   CURTIS, and JACK FOSTER,          )
                                      )
6                   Plaintiffs,       )
                                      )
7            vs.                      )No. CV-11-01502 PJH
                                      )
8   CITY OF ANTIOCH, ANTIOCH POLICE   )
    DEPARTMENT, JAMES HYDE, CHIEF OF )
9   ANTIOCH POLICE DEPARTMENT, NORMAN)
    WIELSCH, JOSHUA VINCELET, JAMES   )
10  WISECARVER JR., STEVEN AIELLO,    )
    AND DOES 1-20, inclusive,         )
11                                    )
                    Defendants.       )
12  _____)

13

14

15

16              DEPOSITION OF JAMES WISECARVER

17                   Vallejo, California

18                    March 13, 2015

19

20

21

22  ATKINSON-BAKER, INC.
    COURT REPORTERS
23  (800) 288-3376
    www.depo.com
24  REPORTER: LAURA AXELSEN, CSR 6173
    FILE NO.:  A902F9F

25

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                         ---oOo---

 4    SEAN O'TOOLE, KELLEY O'TOOLE,    )
      STEVEN DANIEL LEE, JENNIFER LYNN )
 5    CURTIS, and JACK FOSTER,         )
                                       )
 6                   Plaintiffs,       )
                                       )
 7            vs.                      ) No. CV-11-01502 PJH
                                       )
 8    CITY OF ANTIOCH, ANTIOCH POLICE  )
      DEPARTMENT, JAMES HYDE, CHIEF OF )
 9    ANTIOCH POLICE DEPARTMENT, NORMAN)
      WIELSCH, JOSHUA VINCELET, JAMES  )
10    WISECARVER JR., STEVEN AIELLO,   )
      AND DOES 1-20, inclusive,        )
11                                     )
                     Defendants.       )
12    _____)

13                         --oOo--

14         BE IT REMEMBERED THAT, pursuant to Notice and

15    on Friday, March 13, 2015 at 10:06 a.m. thereof at

16    521 Georgia Street, Vallejo, California, before me,

17    LAURA AXELSEN, a Certified Shorthand Reporter,

18    personally appeared

19                    JAMES WISECARVER,

20    called as a witness by the plaintiffs.

21                         ---oOo---

22

23

24

25
```

2

1      Q.   Do you rely on the peace officers legal        10:38:32

2   sourcebook to rely upon the Fourth Amendment?

3      A.   Yes, sir.

4      Q.   Okay.  So, uhm, are you -- you've

5   testified -- how many search warrant affidavits have   10:38:50

6   you written at -- from 2009 earlier?

7      A.   I don't know the numbers, but I'd say

8   between 50 to 100.

9      Q.   And when you write a search warrant, uhm,

10  do you have to be abreast of the law as it pertains     10:39:14

11  to the Fourth Amendment and search and seizure?

12     A.   Yes, sir.

13     Q.   Okay.  Uhm, are you familiar with a case

14  called Terry versus Ohio?

15     A.   Yes, sir.                                        10:39:31

16     Q.   What is that?

17          MR. BLECHMAN:  Calls for a legal

18  conclusion.  You can respond.  Overbroad as well.

19          THE WITNESS:  It's a case law decision

20  that I -- I can't spout the details of it as we sit     10:39:43

21  here.

22          MR. PORI:   Q.   Okay.  So have you ever

23  seen Terry versus Ohio mentioned in the peace

24  officers sourcebook?

25     A.   I don't recall.                                 10:40:07

1     Q.   Have you ever seen -- okay.  So how are     10:40:08

2  you taught -- how do you know -- well, let me ask

3  you this way.  Are there situations where you may

4  not approach someone and stop and frisk them if

5  you -- if you think that they might have possibly     10:40:30

6  some contraband in their possession?

7          MR. BLECHMAN:  Incomplete hypothetical.

8  Vague and ambiguous.  And overbroad.  You can

9  respond.

10         THE WITNESS:  I'm sorry.  I'm confused by     10:40:43

11  the question.

12         MR. PORI:   Q.   Sure.  Are you aware of

13  any -- any situations where you not may [sic] simply

14  go up and walk -- walk up to someone and search

15  them?                                                 10:40:50

16         MR. BLECHMAN:  Same objections.  Go ahead.

17         THE WITNESS:  I'm sorry.  I just don't

18  know what you mean by -- when you say I may -- I

19  "not may."

20         MR. PORI:   Q.   Okay.  Let me ask you       10:40:58

21  this way.  Tell me the -- the conditions under which

22  you may approach someone and stop them and search

23  them for contraband?

24         MR. BLECHMAN:  Same objections.  Also

25  calls for a legal conclusion.                         10:41:11

```
 1    Overbroad.  Vague as to time.  At any point in time    10:48:09

 2    in his career?

 3              MR. PORI:  Yes.

 4              MR. BLECHMAN:  Is that the question?

 5              MR. PORI:   Q.   Yeah, at any time in your    10:48:16

 6    career, have you reviewed any learning domains

 7    regarding the Fourth Amendment?

 8              MR. BLECHMAN:  Same objections.

 9              THE WITNESS:  Yes.

10              MR. PORI:   Q.   Where?                        10:48:22

11         A.   The police academy.

12         Q.   And how long ago was that?  Before 2009?

13         A.   It was probably -- the police -- I went to

14    the police academy in the mid '90s.

15         Q.   Okay.  Okay.  Do you -- uhm, do you own --    10:48:45

16    do you personally own your own police officers legal

17    sourcebook?

18         A.   I do.

19         Q.   Do you refer to it when you are doing your

20    job as a police officer?                                10:49:04

21         A.   Yes, sir.

22         Q.   Okay.  And how often do you refer to it?

23         A.   I guess it depends on what it is that I'm

24    doing.  I -- I don't have an estimated frequency.

25         Q.   Do you -- do you keep a copy with you?        10:49:18
```

1      A.    No.                                                    10:49:20

2      Q.    So you don't have a copy in your patrol

3  car?

4      A.    No, sir.

5      Q.    Okay.  Uhm, very well.  Can you tell me            10:49:24

6  the -- the chain of command regarding the narcotics

7  unit of the -- of the Antioch Police Department in

8  2009?

9      A.    Sure.  We had narcotics detectives, four,

10 including myself.                                           10:50:05

11     Q.    And who were they?

12     A.    They were, like I said, myself, as well as

13 Detective Joshua Vincelet, Detective Steven Aiello,

14 and Detective Michael Mortimer.  And we have a

15 supervisor, a sergeant by the name of Steve Bias.          10:50:27

16 And at the time the lieutenant was Leonard Orman.

17     Q.    Okay.  So is it fair to say that if there

18 was a narcotics case that the City of Antioch was

19 working on, that the narcotics detectives would work

20 together?                                                   10:50:58

21     A.    Yes, sir.

22     Q.    And is it fair to say that there would --

23 there -- if -- there -- if the officers are

24 executing a search warrant, that they have a

25 supervising officer present?                               10:51:11

1      A.   Yes, sir.                              10:51:13

2      Q.   Okay.  Is it fair to say that the

3  supervising officer is there to ensure that the

4  Antioch Police Department regulations and the -- the

5  law of California and the Constitution are -- are     10:51:29

6  followed?

7      A.   Yes.

8      Q.   Okay.  I want to ask you about an incident

9  that occurred at the Grow It Yourself Gardens

10 October 14th, 2009.  That was a Wednesday.  Do you    10:51:43

11 recall that?

12     A.   I do.

13     Q.   Okay.  And who -- who were the officers

14 who were present for that -- for the, uhm, response

15 to the Grow It Yourself Gardens in Antioch,           10:52:08

16 California?

17     A.   I don't recall all of the officers

18 involved, however, I can tell you that I was

19 supervising the search as an acting sergeant.

20 Detective Josh Vincelet was there.  Detective Steve   10:52:24

21 Aiello was there.  Detective Desmond Bittner was

22 there.  Detective Ron Krenz was there.  Detective

23 Bergerhouse was there.  And I don't recall who else.

24     Q.   Joannides?

25     A.   I believe Detective Joannides was there.    10:53:02

1      Q.   Okay.                                          11:26:33

2      A.   I --

3      Q.   But -- okay.

4      A.   I don't even know who -- who would have

5  brought him down to the police department.           11:26:36

6      Q.   So you usually -- is -- don't you usually

7  call for patrol and have somebody from patrol

8  transport a prisoner?

9      A.   I don't recall if we had patrol do it or

10 if we had another detective do it.  I don't           11:26:47

11 remember.  It was long time ago.

12     Q.   Okay.  And you didn't review any documents

13 or anything in preparation of your testimony today,

14 did you?

15     A.   I don't believe I actually wrote a -- a--   11:27:01

16 a report for the Grow It Yourself Gardens.

17     Q.   Okay.  So you didn't review -- review any

18 report.  You knew you were going to be deposed today

19 about the Grow It Yourself Gardens, right?

20     A.   Yes, sir.                                     11:27:15

21     Q.   And you've sat in a couple of these

22 depositions, right?

23     A.   Yes, I have.

24     Q.   And you know -- and which depositions did

25 you sit in?                                            11:27:20

1    Vincelet wrote for an additional marijuana grow in        11:28:39

2    Tulare Court.

3         Q.   What else did you review?

4         A.   Oh, I -- I reviewed a report that I wrote

5    for the -- for my involvement in a -- investigation        11:29:17

6    of an officer involved shooting located at

7    1017 H Street in Antioch.

8         Q.   Anything else?

9         A.   That's all that I can remember right now.

10        Q.   Okay.  Are you aware of whether or not the        11:29:43

11   City of Antioch has departmental regulations

12   regarding execution of search and arrest warrants?

13        A.   There -- there is, yes.

14        Q.   And have you reviewed those regulations

15   regarding execution and -- and search of felony             11:30:18

16   arrest warrants?

17        A.   Not recently.

18        Q.   Are you familiar with the material?

19        A.   Vaguely.

20        Q.   As a training officer, do you advise             11:30:29

21   officers to familiarize themselves with departmental

22   regulations of the Antioch Police Department?

23        A.   Yes.

24        Q.   I'd like this marked as 71, please?

25             MR. BLECHMAN:  I think it's 70.                   11:30:44

1        and secured the business.                          11:43:30

2            Q.   Okay.  So you didn't have an operational

3        plan, though, did you?

4            A.   It was a verbal op- -- op- -- operational

5        plan.                                              11:43:36

6            Q.   Okay.  It was a verbal operational plan.

7        Okay.  And you didn't -- because you didn't have

8        time to get a written one?

9            A.   If it would -- if -- if I would have

10       completed a written operational plan, it would have  11:43:51

11       slowed down the operation.

12           Q.   Okay.  And you've already testified you

13       don't know whether or not Steven Lee was removing

14       items from his -- from the store and putting them in

15       his car in relation to when the O'Tooles were        11:44:11

16       arrested, right?

17           A.   That's correct.

18           Q.   So you don't know if it was before or

19       after?

20           A.   Correct.                                    11:44:21

21           Q.   And that's not in -- that was -- that

22       information was not included in the search warrant,

23       correct?

24           A.   I don't recall.

25           Q.   Okay.  Because you didn't review the        11:44:32

1    search warrant?                                              11:44:35

2         A.   I don't believe I did.

3         Q.   As operation -- as the -- the supervising

4    officer, you never reviewed the search warrant

5    before you went in to serve it into the Grow It        11:44:41

6    Yourself Gardens; is that correct?

7         A.   I don't believe I did.

8         Q.   Why didn't you review the search warrant

9    before you went into the Grow It Yourself Gardens?

10        A.   Well, we went to the Grow It Yourself        11:44:53

11   Gardens before the search warrant was actually

12   written, and we removed all the occupants from the

13   business.  So it hadn't been written yet.

14        Q.   But you were -- I -- when I was -- my

15   question was, when the search warrant was -- was       11:45:09

16   executed -- when the search warrant was brought to

17   the store?

18        A.   Oh.

19        Q.   Right?

20        A.   I'm sorry.  You said when I went to the       11:45:17

21   business.  I misunderstood.

22        Q.   Okay.  You didn't go into the business

23   with the -- to -- when the search warrant was

24   served?

25             MR. BLECHMAN:  Vague and ambiguous.  If       11:45:29

1    you understand, you can respond.                      11:45:30

2            THE WITNESS:  I'm sorry.  I don't.

3            MR. PORI:  Okay.

4            MR. BLECHMAN:  I don't either.

5            MR. PORI:  Q.  Did you go in -- did you,  11:45:34

6    uhm, go into the business with any officer with a

7    search warrant when the search warrant was being

8    served on the business at Grow It Yourself Gardens?

9        A.   I was at the business when the search

10   warrant was served.                                   11:45:44

11       Q.   Okay.

12       A.   I -- I didn't carry it in, if that's what

13   you mean.

14       Q.   You didn't look at it before you went in?

15       A.   No, sir.                                     11:45:51

16       Q.   What were -- did you -- do you -- did you

17   assist in the search?

18       A.   Yes, I did.

19       Q.   And what -- what did you -- what were you

20   looking for?                                          11:45:58

21       A.   Items listed in the search warrant, such

22   as evidence of marijuana cultivation and/or

23   marijuana sales.

24       Q.   Okay.  And how did you know what to look

25   for if you hadn't reviewed the search warrant         11:46:11

1    affidavit?                                              11:46:14

2         A.   Because we were looking for items that

3    would be associated with marijuana cultivation and

4    marijuana sales, and I've done those investigations

5    before, so I would know what to look for.               11:46:23

6         Q.   But you didn't look at what -- see what

7    the judge authorized you to look for, did he -- did

8    you?

9         A.   I don't recall if I did or not.

10        Q.   So you're -- when you went in to -- to       11:46:33

11   search the business, even though there was a warrant

12   in the hand -- in hand, you relied on your own

13   training and experience to conduct a search rather

14   than the -- the contents of the search warrant,

15   correct?                                                11:46:47

16             MR. BLECHMAN:   Misstates the witness's

17   testimony.   You can respond.

18             THE WITNESS:   I don't recall reading the

19   search warrant.   I might have.   I don't recall if I

20   did, but I understand the investigation of marijuana   11:46:55

21   cultivation, and I understand the investigation of a

22   marijuana for sales investigation.   So I --

23   therefore, I would know what to look for.

24             MR. PORI:   Q.   Okay.   So you didn't know

25   whether there were any limitations placed upon -- on   11:47:15

1    you, as a police officer, in that search warrant by     11:47:18

2    the judge?

3         A.   I was not aware of any limitations.

4         Q.   Because you didn't look at the warrant?

5         A.   I don't recall if I looked at the warrant.   11:47:27

6         Q.   Is that something you would do?

7              MR. BLECHMAN:  Vague and ambiguous.

8    Overbroad.  Incomplete hypothetical.

9              MR. PORI:   Q.   When -- when serving a

10   search warrant at a location, would you review the      11:47:40

11   search warrant before entering the business?

12        A.   Sometimes.

13        Q.   Okay.  Sometimes, sometimes not --

14        A.   Correct.

15        Q.   -- right?                                      11:47:49

16        A.   Correct.

17        Q.   Okay.

18             MR. BLECHMAN:  You need a break or how are

19   you doing?

20             THE WITNESS:  I'm good.                        11:47:51

21             MR. PORI:  You need a break?

22             THE WITNESS:  I'm just -- my mouth's

23   getting dry.

24             MR. PORI:  How about the court reporter?

25   You need some water, sir?                                11:47:56

1          THE WITNESS:  I'm doing good.  I'm -- got      11:47:56

2   my water.  Thank you.

3          MR. PORI:  Madam Reporter, how we doing?

4          THE REPORTER:  Okay.

5          MR. PORI:  Q.   Okay.  Can we keep going?      11:48:01

6   All right.  Did you arrest Daniel Leel?

7      A.   Yes, I did.

8      Q.   Okay.  Did you write a report about the

9   arrest of Daniel Leel?

10     A.   Yes, I did.                                   11:48:21

11     Q.   And when you wrote your report about the

12  arrest of Daniel Leel, were you truthful?

13     A.   Yes.

14     Q.   Were you -- was the statements you made in

15  your report accurate?                                 11:48:29

16     A.   To the best of my recollection.

17     Q.   Did you complete all the elements of the

18  offense when you arrested Daniel Leel?

19     A.   I believe so.

20     Q.   Did you include any material misstatements   11:48:41

21  or inaccurate information in the police report that

22  you wrote after arresting Daniel Leel?

23     A.   I wouldn't say that I completed any

24  inaccurate information.

25     Q.   Okay.  So essentially you were -- when you    11:48:57

1      A.    In my police report I made the statement          11:50:01

2    that we were serving a search warrant on the

3    business, which could be construed as the Grow It

4    Yourself Gardens.  We were in the process -- in

5    actuality, we were in the process of serving the       11:50:17

6    search warrant.  We just had not received the search

7    warrant itself.  The detective was still working

8    with the judge to get the search warrant signed.

9      Q.    Did you write in your police report on

10   October 14th, 2009, the Antioch narcotics unit was     11:50:32

11   conducting an investigation into the Grow It

12   Yourself hydroponic supply store on Sunset Drive in

13   Antioch?

14     A.    Can I look at my police report?

15     Q.    If it'll refresh your recollection.            11:50:46

16     A.    Please.  Thank you.  Yes, sir, I did.

17     Q.    Okay.  Did you write -- do you have --

18   okay.  Do you need that in front of you?

19     A.    Are we going to be --

20          MR. BLECHMAN:  If you're going to ask him        11:51:21

21   a bunch of questions, if you wrote this and that in

22   his report, I mean, do you want to make it an

23   Exhibit?

24          MR. PORI:    Q.    No.  Because I don't want

25   any complaints about Rule 26.  So I'm just using it     11:51:29

```
 1    not -- I'm not required under the Rules to produce    11:55:17

 2    it.  So that's how it's going.

 3              MR. BLECHMAN:  Well, I disagree a little

 4    bit.

 5              MR. PORI:  Well, that's okay.              11:55:25

 6              MR. BLECHMAN:  But we'll let the judge

 7    sort it out down the road.

 8              MR. PORI:  Of course.  That's fine.

 9    That's fine.

10              THE WITNESS:  Okay.  I've reviewed it.    11:57:12

11              MR. PORI:  Q.   Okay.  When you wrote

12    your report, you wrote on October 14th, '09, "The

13    Antioch Police narcotics unit was conducting an

14    investigation into the Grow It Yourself hydroponic

15    supply store on Sunset Drive in Antioch."           11:57:31

16              Was that the first sentence of your

17    report?

18         A.   Yes, sir.

19         Q.   And the second sentence of your report

20    was, "We had served a search warrant on the business  11:57:37

21    and were inside the business gathering evidence of

22    illegal marijuana sales."

23              Did you write that sentence in your

24    report?

25         A.   I did.                                     11:57:47
```

1    Q.   So it wasn't an intentional -- it wasn't        12:01:34

2    intentionally written to misrep- -- misrepresent

3    your presence at the scene of the Grow It Yourself

4    Gardens, was it?

5    A.   I did not intend to misrepresent anybody.       12:01:45

6    My -- my statement -- what I intended to place in

7    the police report was that we were serving the

8    search warrant of The Fashion Statement, which led

9    us to further investigate the marijuana possession.

10   And we were awaiting the search warrant, but what I     12:02:03

11   wrote was that we were serving the search warrant.

12   Q.   Right.  In other words --

13   A.   In actuality, I was still standing by for

14   the search warrant.

15   Q.   So the way you wrote your report, though,         12:02:14

16   it -- it essentially indicates that you were --

17   the -- the narcotics unit was conducting an

18   investigation into Grow It Yourself hydroponic

19   supply store in Antioch.  Second sentence, "We had

20   served a warrant on the business and were inside the     12:02:34

21   business gathering evidence of illegal marijuana

22   sales," correct?

23   A.   That's the way I wrote it, yes, sir.

24   Q.   And what you meant to say is that -- what?

25   That you were gathering evidence before the warrant     12:02:43

1    it as freezing the -- the location?                    12:38:52

2         A.    Sure.   I understand what you mean.

3         Q.    Okay.   So, uhm, what -- under what

4    circumstances is it appropriate to seize a location

5    pending the inch -- issuance of a search warrant?      12:39:05

6              MR. BLECHMAN:   You said seize.   Do you

7    mean freeze?

8              MR. PORI:   Q.   Freeze.

9         A.    So it would depend on the circumstances,

10   but basically the purpose of freezing a location       12:39:15

11   would be to, uhm, protect the integrity of the

12   location itself, protect the integrity of the

13   evidence on scene, protect the safety of all parties

14   involved.

15        Q.    What information do you need before you      12:39:39

16   have the legal authority, as a -- as a police

17   officer, to freeze a business?

18             MR. BLECHMAN:   Calls for a legal

19   conclusion.   Incomplete hypothetical.   Overbroad.

20   Vague and ambiguous.   Go ahead and respond.           12:39:55

21             THE WITNESS:   So basically you would need

22   to have reason to believe that a crime is being

23   committed on a location, and have reason to believe

24   that the freezing of that location would be the

25   appropriate action to do so.   And that would be in    12:40:11

1    you're asking.                                    12:46:41

2        Q.    I'm asking what constitutes freezing a

3    business?

4            MR. BLECHMAN:   Vague and ambiguous.

5    And -- and asked and answered.   Go ahead.        12:46:48

6            MR. PORI:   Q.    What -- what do you do to

7    freeze a business?   I'll ask that question.

8        A.    Well, like I stated before, you would

9    remove the employees and the customers from the

10   business so that you could control and ensure the   12:46:59

11   integrity of the evidence is kept intact, and ensure

12   the safety of all parties involved are kept intact.

13   So basically you would start with removing all

14   people from the business itself.

15       Q.    Okay.   And then what happens after you   12:47:20

16   remove everyone from the business?

17       A.    You conduct a safety sweep to make sure

18   that all parties are accounted for and that we don't

19   have any individuals who might be hiding or lying in

20   wait.                                              12:47:33

21       Q.    And what -- what is the scope of a safety

22   sweep?

23       A.    You know, like I said, you would be

24   looking to make sure that nobody is hiding or lying

25   in wait, there's no obvious traps or hazards that   12:47:45

1   at the time.                                          13:11:25

2        Q.   Do you -- okay.  Do you recall being in

3   the -- and now did you see Detective Aiello walking

4   into the store?

5        A.   I'm sorry.  I was looking at you.          13:11:33

6        Q.   Yeah, I don't blame you.  Going to try it

7   again.  Okay.  Do you see Detective Aiello there?

8        A.   I do.

9        Q.   At some point, does he turn around and

10  walk into the -- into the store?  You see him turn    13:11:42

11  around and walking into the store?

12       A.   Yes.

13       Q.   Okay.  Do you know where he went?

14       A.   I do not.

15       Q.   Is that -- is that part of freezing the    13:11:51

16  store?  Walking into the store after it's been

17  cleared for suspects?

18       A.   It may be.

19            MR. BLECHMAN:  Incomplete hypothetical.

20  Argumentative.  Lacks foundation.  You can respond.   13:12:00

21            THE WITNESS:  It may be.

22            MR. PORI:   Q.   Based on what?

23       A.   I don't know what it is that he was doing.

24       Q.   What would he be doing while the store is

25  being -- after the store had been cleared of          13:12:14

                                                         134

1    suspects?  What would he be doing inside the store?     13:12:17

2            MR. BLECHMAN:  Calls for speculation.  You

3    can respond.

4            THE WITNESS:  I don't recall what he was

5    doing.                                                  13:12:22

6            MR. PORI:    Q.   What should he have been

7    doing after the store had been frozen?

8            MR. BLECHMAN:  Overbroad.  Lacks

9    foundation.  You can respond.

10           THE WITNESS:  I don't know.                     13:12:29

11           MR. PORI:    Q.   Should he have -- should

12   he be walking inside the store after it's frozen?

13       A.   If he had reason to, then sure.

14       Q.   What reason would he -- what reason -- do

15   you know of any lawful reason an officer has to go      13:12:40

16   into a store after it's been frozen?

17           MR. BLECHMAN:  Hold on.  Calls for a legal

18   conclusion.  Lacks foundation.  Calls for

19   speculation.  Incomplete hypothetical.

20           THE WITNESS:  There may be.  I don't know       13:12:54

21   if he had a valid reason because I don't know what

22   he was doing at the time.

23           MR. PORI:    Q.   Okay.  You didn't ask

24   him?

25       A.   I may have, but it was a long time ago and     13:13:02

1      A.   Video cameras?                              13:26:55

2      Q.   Yeah, video cameras.

3      A.   Yes.

4      Q.   And you were concerned that the video

5  cameras were -- were being used to surveil your      13:26:59

6  activities inside the store?

7      A.   Yes.

8      Q.   Okay.  And so you knew where they were,

9  and you were concerned about their presence in the

10 store surveilling your activities while you were      13:27:16

11 inside the store, right?

12      MR. BLECHMAN:  It's compound.  Answer the

13 second question.

14      THE WITNESS:  All right.

15      MR. PORI:  Q.   No -- okay.  Well, it's      13:27:23

16 okay.  You saw cameras and -- and you were concerned

17 about the fact that they were depicting what you

18 were doing in the store; isn't that right?

19      A.   I saw cameras and I was concerned that

20 people were monitoring my actions, and I was          13:27:37

21 concerned for mine and the other safety -- safety of

22 the other officers that were present.

23      Q.   Okay.  And so what did you do to disable

24 those cameras to prevent anybody from looking at

25 you?                                                  13:27:51

                                                            147

1            MR. BLECHMAN:  Lacks foundation.  You        13:27:53

2  can -- assumes facts.  You can respond.

3            THE WITNESS:  I did not disable any

4  cameras.

5            MR. PORI:  Q.   You didn't?  Why did you     13:27:58

6  not disable any cameras?

7       A.   Well, to be honest with you, I don't know

8  how to disable cameras.

9       Q.   Well, did -- did you cover them -- try to

10  cover them up or --                                   13:28:09

11      A.   No, not to -- not that I can recall.

12      Q.   So you weren't concerned enough about them

13  that you were going to move them in any way or try

14  to -- to cover them to prevent people from looking

15  at what you were doing while you were executing a     13:28:22

16  search warrant in The Fashion Statement, right?

17      A.    I -- there were several cameras that were

18  present, and I did move one camera.

19      Q.   You moved only one?

20      A.   Yes.                                         13:28:35

21      Q.   But the other ones inside the store you

22  did not move?

23      A.   No.  That is correct.

24      Q.   And why not?

25      A.   Because they weren't within my reach and     13:28:39

148

1    that you turned the camera was for your own safety?   14:39:25

2         A.   Yes.

3         Q.   At that point, did you -- why -- at that

4    point, why did you not go into the Grow It Yourself

5    Gardens and secure it as you did sometime later?   14:39:35

6         A.   We had to finish securing the first

7    location that we were in.  And then the

8    information -- the -- The Fashion Statement

9    location.  And then at the time, we -- I -- I don't

10   know when it was that Detective Vincelet decided   14:39:51

11   that he wanted to get into the Grow It Yourself

12   store.

13        Q.   Well, my -- my question is, is if you were

14   concerned for your safety and that -- and that --

15   that you might be ambushed -- and I -- by ambushed,   14:40:04

16   I presume you mean someone might come after you with

17   a firearm or some kind of weapon?

18        A.   Could be anything.  If somebody's remotely

19   watching me, watching me from another location, I

20   want to make sure that they're not doing so with ill   14:40:17

21   intentions.

22        Q.   And so -- understood.  And so at that --

23   at the point that you knew that you were being

24   monitored, why did you not, uhm, immediately go into

25   the store and secure your safety by clearing   14:40:28

1    everyone out and clearing the store?                    14:40:31

2        A.   At that point, I didn't think that I had

3    reason to.

4        Q.   Well, then, why did you turn the camera?

5        A.   Because I did not want to be ambushed by       14:40:39

6    anybody who might be remotely monitoring me.

7        Q.   Once you learned that you were being

8    remotely monitored, what did you do next?

9        A.   I went through -- we made sure that we

10   continued our route through The Fashion Statement,      14:40:52

11   including the warehouse that was just displayed in

12   the video, and we rendered it safe by making sure

13   that all individuals were accounted for.

14       Q.   By the time you went into the warehouse,

15   hadn't everybody else been -- by the time you           14:41:09

16   entered the warehouse, hadn't the door been locked

17   and the employees inside the store already gone?

18           MR. BLECHMAN:   In The Fashion Statement?

19           MR. PORI:   Q.   In The Fashion Statement?

20       A.   Yes.                                            14:41:24

21       Q.   Okay.  So by the time you went into the

22   warehouse of The Fashion Statement, you had walked

23   through the -- the sales area, correct?

24       A.   Correct.

25       Q.   And there was no one there, correct?           14:41:33

1    into The Fashion Statement if you were concerned          14:42:10

2    that you were going to be ambushed?  Why did you not

3    take steps to protect yourself and your fellow

4    officers?

5         A.   I was in The Fashion Statement.          14:42:18

6         Q.   When -- aft- -- after you were in The

7    Fashion Statement and you turned the camera for your

8    own safety, why did you not go -- then go into the

9    Grow It Yourself Gardens and -- to secure the safety

10   of yourself and your other officers?          14:42:31

11        A.   I didn't know that --

12             MR. BLECHMAN:  It's asked and answered.

13   But go ahead and answer it again.

14             THE WITNESS:  I didn't know that I had

15   reason to at that time.          14:42:36

16             MR. PORI:   Q.   So you were concerned

17   that you would be ambushed, but you didn't know who

18   would ambush you; is that the idea?

19        A.   I can take steps to protect my safety

20   without having all the answers to all my questions.          14:42:48

21        Q.   Okay.  So you're saying that the reason

22   you turned the camera was for officer safety?

23        A.   Yes, sir.

24        Q.   Okay.  Uhm, and you realized that, uhm,

25   cameras can be useful in preserving evidence,          14:43:04

1    you can't tell me how long these individuals were        15:34:21

2    detained, right?

3         A.   I don't recall.

4         Q.   As a supervising officer, though, you --

5    you -- you believe this -- this behavior is              15:34:27

6    consistent with the lawful seizure of -- I mean

7    freezing of a business, correct?

8         A.   I do.

9         Q.   And you believe this is a proper,

10   lawful -- and based upon the right to freeze the         15:34:43

11   business, you believe, as a supervising officer,

12   that these individuals are being lawfully asked to

13   sit down on these buckets, correct?

14             MR. BLECHMAN:  Calls for a legal

15   conclusion.  Go ahead and respond.                       15:34:55

16             THE WITNESS:  It appears so.

17             MR. PORI:   Q.   Okay.  As a supervising

18   officer, you believe these individuals can be

19   detained because there might be a possible marijuana

20   grow inside the store; isn't that right?                 15:35:07

21        A.   They're going to be detained until you can

22   determine their involvement in the crime that we're

23   investigating.

24        Q.   Okay.  Which is what?

25        A.   The marijuana cultivation and illegal         15:35:21

1      Q.   Did you have any further involvement with      15:39:20

2  the case, other than on this day, the incident?

3      A.   On this particular search warrant?

4      Q.   Yes.   October 14th, 2009.

5      A.   Not that I can recall.                          15:39:32

6      Q.   You see the individual wearing the white

7  shirt holding something?  Who is that?  Is that

8  Stephanie Chalk?

9      A.   It looks like it.

10     Q.   Okay.   Do you see Stephanie Chalk walking      15:40:22

11 in the building?

12     A.   I did.

13     Q.   Okay.   And what does Stephanie Chalk do?

14     A.   She's a community service officer.

15     Q.   What's a community service officer do?         15:40:34

16     A.   She was assigned to the investigations

17 bureau for -- as a photographer in evidence

18 collection.

19     Q.   Okay.   So she -- she is in the store while

20 these individuals are being detained so that she can    15:40:47

21 do what?

22     A.   I don't know.

23          MR. BLECHMAN:  Calls for speculation.

24          MR. PORI:   Q.   Who's that?  Who's

25 present at the door?  Is that Detective Joannides?      15:41:05

222

```
 1                        CERTIFICATE

 2          I, the undersigned, a Certified Shorthand

 3   Reporter, State of California, hereby certify that

 4   the witness in the foregoing deposition was by me

 5   first duly sworn to testify to the truth, the whole

 6   truth, and nothing but the truth in the

 7   within-entitled cause; that said deposition was

 8   taken at the time and place therein stated; that the

 9   testimony of the said witness was reported by me, a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting; that the

12   foregoing is a full, complete, and true record of

13   said testimony; and that the witness was given an

14   opportunity to read it and, if necessary, correct

15   said deposition and to subscribe the same; that

16   prior to the completion of the foregoing

17   deposition, review of the transcript was requested.

18          I further certify that I am not of counsel

19   or attorney for either or any of the parties in the

20   foregoing deposition and caption named, nor in any

21   way interested in the outcome of the cause named in

22   said caption.

23          Executed this 24th day of March, 2015.

24          _____

25          LAURA AXELSEN, C.S.R. 6173
```