UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SEAN O'TOOLE, et al.,

          Plaintiffs,

    v.

CITY OF ANTIOCH, et al.,

          Defendants.

Case No. 11-cv-1502-PJH

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**

On July 8, 2015, three motions for summary judgment came on for hearing before this court:  (1) a motion for partial summary judgment filed by plaintiffs Sean O'Toole, Kelley O'Toole, Steven Daniel Lee, Jennifer Lynn Curtis, and Jack Foster (collectively, "plaintiffs"); (2) a motion for summary judgment filed by defendants Joshua Vincelet, James Wisecarver, Steven Aiello, Steven Bergerhouse, Matthew Koch, Desmond Bittner, Leonard Orman, Ronald Krenz, Danielle Joannides, and Stephanie Chalk (collectively, the "Antioch defendants"); and (3) a motion for summary judgment filed by defendant Norman Wielsch.  Plaintiffs appeared through their counsel, Tim Pori.  The Antioch defendants appeared through their counsel, Noah Blechman.  Defendant Wielsch appeared through his counsel, Robert Henkels.  Also before the court is a fourth motion for summary judgment, filed by defendants City of Antioch and James Hyde (referred to as "the Monell defendants").  Having read the papers filed in conjunction with the motions and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

This case arises out of a number of allegedly illegal searches and/or seizures. While the operative third amended complaint ("TAC") lacks a clear statement of the facts, the court has pieced together the TAC's allegations with the facts set forth in the parties' motion papers. Because the relevant incidents involve non-overlapping sets of plaintiffs, it is clearer to organize the facts by the groups of plaintiffs, rather than by chronology.

The first set of plaintiffs consists of Sean O'Toole, Kelley O'Toole, and Steven Daniel Lee. The O'Tooles own a business called "Grow It Yourself Gardens" ("GIYG") in Antioch, California, which sells hydroponic gardening equipment. Lee is an employee of GIYG.

The O'Tooles also own an adjacent commercial space, which they lease to non-party Anthony Denner, who runs a clothing business called the "Fashion Statement" ("FS") out of that location.

On October 14, 2009, officers from the Antioch Police Department[1] executed a search warrant on FS, looking for counterfeit clothing items. As officers approached the location, they saw Denner and Kelley O'Toole ("Kelley") leaving FS. Pursuant to the search warrant, they were both detained.

Officers then searched FS, noticing the smell of marijuana. They found a locked room (the papers are not clear as to how the officers gained access to the locked room) containing hydroponic growing equipment and "remnants of marijuana plants." Officers also found marijuana user paraphernalia and a loaded shotgun, and found video cameras throughout the FS location.

Vincelet spoke to Denner and Kelley, with Denner stating that he rented the location from the O'Tooles, that he had no knowledge of the growing equipment, and that only the O'Tooles had access to the locked room. Kelley confirmed that she and Sean

---

[1] The complaint alleges that defendants Wielsch, Vincelet, Wisecarver, Aiello, Bergerhouse, Orman, Krenz, Koch, Bittner, Joannides, and Chalk were present to execute the warrant. TAC, ¶ 19.

1    were the landlords of FS, and that Denner did not have access to the locked room.

2    Denner also stated that he believed the video cameras were controlled from somewhere

3    in the GIYG store.

4          There is a dispute about what happened next — defendants claim that Kelley gave

5    her GIYG keycard to Vincelet and granted him access, while plaintiffs claim that no

6    consent was given, and that officers "confiscated" the keycard.

7          In any event, officers then went to GIYG, where they asked Sean for consent to

8    walk through the business.  Sean refused.  The papers also make clear that, while the

9    business was open to the public, the front door was secured by an electronic lock, so

10   customers could enter only if a store employee granted them access.  Sean did agree to

11   give officers access to a back room, but it was the same room that the officers had

12   already accessed via FS.

13         Vincelet then conferred with Wisecarver about what to do next.  At this time,

14   plaintiff Lee was seen leaving GIYG with a black backpack and placing it in his vehicle.

15         The chronology of events around this time has been muddled by the parties, but at

16   some point, officers decided to freeze the GIYG location pending the issuance of a

17   search warrant.  Also around this time, officers allegedly obtained consent to search

18   Lee's vehicle (including the backpack, which was inside), and found marijuana.

19         Officers pat-searched the employees of GIYG and detained them, pending the

20   issuance of a search warrant.  Officers later obtained a search warrant, and ultimately

21   found cash, firearms, and marijuana.

22         Lee was later charged with possession of marijuana with the intent to sell, but was

23   found not guilty.

24         Based on these events, the O'Tooles assert four causes of action:  (1) a § 1983

25   claim against the individual officers involved in the GIYG search[2], (2) a claim for

26

27   _____

     [2] The complaint does not actually make clear against whom this claim is brought, as
     plaintiffs repeatedly use the blanket term "defendant officers" in the context of this claim.
28   The court will more fully address the issue of which claims are brought against which
     defendants in the "discussion" section of this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  conspiracy to violate § 1983 against the same officers, (3) a <u>Monell</u> claim against the City

2  of Antioch and its police chief[3], and (4) a civil RICO claim against some subset of the

3  officers who were present at the search (on the basis that they were involved in a broader

4  joint venture).

5   Lee asserts the same four causes of action arising out of the GIYG search, but

6  also adds two additional claims:  (5) a malicious prosecution claim against defendants

7  Vincelet and Aiello, and (6) a retaliatory prosecution claim against Vincelet and Aiello.

8   The second set of plaintiffs is made up of Jennifer Lynn Curtis and Jack Foster.

9  Their allegations arise out of three separate police searches — two of which involve only

10  Curtis, and one of which involves both Curtis and Foster.

11   The first search occurred on June 28, 2007, and was conducted by the Contra

12  Costa County Narcotics Enforcement Team ("CCCNET") at 701 Thompsons Drive,

13  Brentwood, California.  That home was owned by non-party Kevin Ackerman, Curtis'

14  boyfriend.  Curtis was not actually present for the search, but claims that defendants

15  Vincelet, Wielsch, Lombardi, and Wisecarver took $20,000 in cash that was either not

16  accounted for on the search warrant return, or was listed as several different amounts,

17  with entries being "inexplicably scratched off."  Curtis also claims that a camera and a

18  digital camcorder were taken, but not listed on the search warrant return.

19   The second search occurred either on August 11, 2008, or sometime in the fall of

20  2008.  There is some confusion here, because while the parties agree that a search was

21  conducted on August 11, 2008, defendants cite to Curtis' deposition testimony stating

22  that no property was taken at that time, and that there was another, later search during

23  which property was taken.  However, in that same deposition, Curtis admits to confusion

24  about the dates, even stating that she felt tricked by the officers into remembering the

25

26  [3] As mentioned above in footnote 1, plaintiffs name the Antioch Police Department as a
    defendant in the caption of the TAC, but the body of the complaint does not assert any

27  claim against the Antioch Police Department.  To the extent that plaintiffs intend to assert
    a claim against the Antioch Police Department, the court will presume that only the claim

28  which is brought against the City of Antioch (i.e., the <u>Monell</u> claim) is also brought against
    the Antioch Police Department.

1   wrong dates.  Putting aside this confusion, Curtis does allege that, sometime in 2008,

2   defendants Wielsch, Wisecarver, Vincelet, and Lombardi searched Ackerman's home,

3   and that she was handcuffed and ordered to lay face down on the ground, despite being

4   seven months pregnant.  Curtis also claims that officers took a "Swiss Ice" watch[4] valued

5   at $22,500, a necklace, a set of earrings, and "several thousand" dollars in cash.  Curtis

6   claims that no search warrant return was ever filed.

7          Finally, on January 5, 2010, defendants Wielsch and Vincelet served a search

8   warrant on the residence of plaintiff Foster, who was renting a home owned by

9   Ackerman.  Because Ackerman was in prison at the time, Curtis would check in on the

10  house and would collect rent.  Officers were looking for evidence of marijuana cultivation,

11  and arrested Foster after finding such evidence.  Officers also allegedly took several

12  shotguns, currency, jewelry, sunglasses, and sports memorabilia without listing them on

13  a search warrant return.  Some of this property belonged to Foster, while some belonged

14  to Curtis or her son.

15         Curtis arrived at the residence to collect rent, and was detained and handcuffed,

16  then arrested and eventually released.  Curtis alleges that defendants searched her

17  locked car and seized her wallet, cell phone, and sunglasses, none of which were

18  documented on a search warrant return.

19         Curtis and Foster each assert four causes of action — Curtis' are based on all

20  three searches, whereas Foster's are based only on the January 2010 search and arrest.

21  They both bring the following four claims:  (1) a § 1983 against individual officers, (2) a

22  claim for conspiracy to violate § 1983, (3) a Monell claim against the City of Antioch and

23  its police chief, and (4) a civil RICO claim.

24

25

26

27  ─────────────────
    [4] In 2011, Curtis was asked to identify a watch that was found buried in Lombardi's
28  backyard, and positively identified it as the watch taken from Ackerman's house.
    Lombardi claims that the watch was given to him by Wielsch, which Wielsch denies.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DISCUSSION**

A.      Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e).  But allegedly disputed facts must be material – the existence

6

1   of only "some alleged factual dispute between the parties will not defeat an otherwise

2   properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

3       When deciding a summary judgment motion, a court must view the evidence in the

4   light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

5   Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

6   B.  Legal Analysis

7       1.  Claims asserted by the O'Tooles and Lee

8       The court will first address the claims arising out of the search of Grow It Yourself

9   Gardens (i.e., the claims brought by Sean O'Toole, Kelley O'Toole, and Steven Daniel

10  Lee).  As mentioned above, the operative complaint is far from clear regarding which

11  claims are brought by which plaintiffs against which defendants.  Under the headings for

12  the first three causes of action, the complaint states that "plaintiffs Sean O'Toole, Kelley

13  Barbara O'Toole, Steven Daniel Lee, Jennifer Lynn Curtis, and Jack Foster reallege and

14  incorporate" all of the previous paragraphs of the complaint.  Thus, the court will assume

15  that each of the first three claims is asserted by all five plaintiffs.

16      Under the heading for the fourth cause of action, the operative TAC states only

17  that "plaintiffs incorporate by reference rhetorical paragraphs 1-112 as if fully set forth

18  herein," but does not name any specific plaintiffs (nor does the TAC explain what is

19  meant by "rhetorical paragraphs").  To err on the side of over-inclusion, the court will

20  assume that the fourth cause of action is intended to be asserted by all five plaintiffs.

21      Under the headings for the fifth and sixth causes of action, the TAC states only

22  that "plaintiff Steven Daniel Lee realleges and incorporates" the previous paragraphs.

23  Thus, the court will assume that the fifth and sixth causes of action are asserted by

24  plaintiff Lee.

25      Based on the above, it appears that plaintiffs Sean and Kelley O'Toole each assert

26  the first four causes of action, and that plaintiff Lee asserts all six causes of action.  The

27  court's next step is to determine which defendants those claims are asserted against.

28      On the first cause of action, for deprivation of rights under section 1983, the

United States District Court
Northern District of California

7

1    complaint offers no guidance, as it contains only blanket references to "defendant

2    officers" without making any attempt to name any specific officers.  For now, the court will

3    again err on the side of over-inclusion, and assume that the O'Tooles and Lee intend to

4    assert their section 1983 claim against all individual officers, but to the extent that certain

5    officers are not alleged to have participated in the search of GIYG, the court will dismiss

6    this claim as to them.

7           On the second cause of action, for conspiracy to violate civil rights under section

8    1983, plaintiffs similarly rely on blanket references to "defendant officers," though they

9    also allege that the officers did so under the supervision of defendant Leonard Orman.

10   Thus, the court will again err on the side of over-inclusion for now, and assume that the

11   O'Tooles and Lee intend to assert their section 1983 conspiracy claim against all

12   individual officers, but to the extent that certain officers are not alleged to have

13   participated in the search of GIYG, the court will dismiss this claim as to them.

14          On the third cause of action, a section 1983 claim brought under a <u>Monell</u> liability

15   theory, plaintiffs allege that only defendants City of Antioch and Chief James Hyde are

16   liable under <u>Monell</u>.  While plaintiffs do reference the "acts of the defendant officers," they

17   do so only to allege that those acts are "the direct and proximate result of the deliberate

18   indifference and policy and/or practice of conduct of defendants City and Hyde."  Notably,

19   as mentioned above, plaintiffs do not include the Antioch Police Department as part of

20   this claim or any other claim, despite its inclusion in the case caption.  And as also

21   mentioned above, the court will assume that plaintiffs' claims against the Police

22   Department are co-extensive with their claims against the City, and thus will assume that

23   plaintiffs intend to assert the <u>Monell</u> claim against the City, the Police Department, and

24   Chief Hyde.

25          On the fourth cause of action, for violation of civil RICO, plaintiffs do specifically

26   name the following defendants:  Wielsch, Lombardi, Vincelet, Wisecarver, Aiello,

27   Bergerhouse, Koch, Bittner, and Butler.  The court does note that the complaint identifies

28   only two predicate acts as part of this claim, both of which involved searches of Curtis

United States District Court
Northern District of California

1   and/or Foster (i.e., not the search of the O'Tooles and Lee at the GIYG location), but for

2   now, the court will assume that the O'Tooles and Lee intend to assert this claim against

3   the named defendants.

4        Finally, on the fifth and sixth causes of action (for malicious prosecution and

5   retaliatory prosecution, respectively), only defendants Vincelet and Aiello are named.

6        Thus, in sum, the court finds that the following asserted claims arise out of the

7   search of the O'Tooles and Lee at the GIYG location:  (1) a section 1983 claim asserted

8   by the O'Tooles and Lee against all individual defendants; (2) a claim for conspiracy to

9   violate section 1983 asserted by the O'Tooles and Lee against all individual defendants;

10  (3) a Monell claim asserted by the O'Tooles and Lee against the City of Antioch, the

11  Antioch Police Department, and Chief James Hyde; (4) a civil RICO claim asserted by the

12  O'Tooles and Lee against Wielsch, Lombardi, Vincelet, Wisecarver, Aiello, Bergerhouse,

13  Koch, Bittner, and Butler; (5) a malicious prosecution claim asserted by Lee against

14  Vincelet and Aiello; and (6) a retaliatory prosecution claim asserted by Lee against

15  Vincelet and Aiello.

16       The court's next step is to determine which defendants are actually alleged to

17  have been involved in the search of GIYG, based on the parties' representations in the

18  current motion papers and at the hearing.  To the extent that any individual defendants

19  are not alleged to have been involved in that search, no claim can be asserted against

20  them by the O'Tooles or Lee.

21       At the hearing, both parties agreed that defendants Vincelet, Wisecarver, Aiello,

22  Bergerhouse, Krenz, Koch, Bittner, Joannides, Chalk, and Orman were present at some

23  point during the search of GIYG.  The parties also agreed that Wielsch was not present at

24  the search, and thus, Wielsch's motion for summary judgment is GRANTED as to all

25  claims asserted by the O'Tooles and Lee.  The parties also appear to agree that

26  defendants Lombardi, Butler, and Hyde were not present at any point during the GIYG

27  search.  As a result, to the extent that the O'Tooles or Lee purport to assert any claims

28  against Lombardi, Butler, or Hyde (in his individual capacity), those claims are dismissed

United States District Court
Northern District of California

1   under Federal Rule of Civil Procedure 41(b), as plaintiffs have not complied with the rules

2   of pleading as to those defendants.

3        Thus, having parsed the complaint and the parties' papers, the court is now left

4   with the following claims asserted by the O'Tooles and Lee:  two § 1983 causes of action

5   against defendants Vincelet, Wisecarver, Aiello, Bergerhouse, Krenz, Koch, Bittner,

6   Joannides, Chalk, and Orman; a <u>Monell</u> claim against defendants Hyde, the City of

7   Antioch, and the Antioch Police Department; and a RICO claim against defendants

8   Vincelet, Wisecarver, Aiello, Bergerhouse, Koch, and Bittner.  Also remaining are two

9   additional causes of action asserted by Lee against defendants Vincelet and Aiello,

10  related to Lee's prosecution.  The Antioch defendants and the <u>Monell</u> defendants seek

11  summary judgment on all claims asserted against them, while plaintiffs move for partial

12  summary judgment only on the two § 1983 causes of action.  The court will now address

13  the merits of the motions.

14       The allegations surrounding the GIYG search start with the officers' execution of a

15  search warrant for the Fashion Statement store, and the accompanying detention of

16  Kelley O'Toole and non-party Denner.  Plaintiffs argue that the search warrant is

17  unsigned and thus invalid, and defendants did not respond to this argument in their reply.

18  However, defendants have attached the warrant as an exhibit to their counsel's

19  declaration, which shows that the search warrant affidavit was signed by a magistrate,

20  although the search warrant form itself is blank.  <u>See</u> Dkt. 136-3, Ex. K.  Given that the

21  magistrate signed the search warrant affidavit, combined with the level of detail provided

22  on the affidavit, the court finds that the officers relied in good faith on the warrant, despite

23  its apparent facial deficiency.  <u>See</u> <u>Ortiz v. Van Auken</u>, 887 F.2d 1366, 1370 (9th Cir.

24  1989).

25       Plaintiffs then argue that the warrant does not list any names under the heading

26  for "persons," but they also concede that Kelley O'Toole was seen leaving the store

27  "accompanying an individual who exhibited ownership or control."  Dkt. 158 at 15.

28  Plaintiffs argue that, "[w]ithout more, her detention was unlawful," but they offer no

10

1    authority to back up that assertion, and in fact, the authority cited by defendants compel

2    the opposite result.  Specifically, the Supreme Court held in <u>Michigan v. Summers</u> that "a

3    warrant to search for contraband founded on probable cause implicitly carries with it the

4    limited authority to detain the occupants of the premises while a proper search is

5    conducted."  452 U.S. 692, 705 (1981); <u>see also</u> <u>Ganwich v. Knapp</u>, 319 F.3d 1115, 1120

6    (9th Cir. 2003).  While the <u>Summers</u> Court noted that "special circumstances, or possibly

7    a prolonged detention, might lead to a different conclusion in an unusual case," and while

8    plaintiffs do argue in their opposition brief that Kelley O'Toole's detention was

9    "unreasonably prolonged," plaintiffs provide no support for that assertion – in fact, the

10   brief does not inform the court of basic facts such as how long the detention lasted.  The

11   court cannot find a triable issue of fact as to whether Kelley O'Toole's detention was

12   "unreasonably prolonged" without any testimony regarding the length of the detention, or

13   any authority supporting a finding that the length of her detention was unreasonably

14   prolonged.  For that reason, the court finds that plaintiffs have failed to raise a triable

15   issue of fact regarding the constitutionality of the initial entry into the Fashion Statement

16   and the accompanying detention of Kelley O'Toole.

17          After the detention, defendants somehow gained access to Kelley O'Toole's

18   keycard for the GIYG location.  There is a dispute over how officers obtained the keycard,

19   with plaintiffs claiming that the keycard was "confiscated" from Kelley O'Toole, and with

20   defendants first arguing (in their opening motion) that Kelley O'Toole "agreed to give

21   Vincelet access to GIYG and gave Vincelet access to the store," but then arguing in reply

22   that "it is immaterial if Kelley O'Toole voluntarily provided her key to GIYG to the involved

23   officers or officers confiscated that key prior to entering the GIYG business" because "the

24   GIYG business was open for business and to the public at the time of the incident."

25          The court finds that there is a disputed issue of material fact as to whether Kelley

26   O'Toole voluntarily gave her keycard to the defendant officers or whether the keycard

27   was confiscated involuntarily.  At her deposition, Kelley O'Toole testified that defendant

28   Vincelet "didn't really ask.  He took it.  I mean, I didn't offer it freely, obviously," and that "I

1    didn't volunteer it. None of this interaction was voluntary." Dkt. 159, Ex. 14 at 54:24-25,

2    55:22-23.  In contrast, in defendant Vincelet's deposition, he testified that Kelley O'Toole

3    "offered the key" to him.  Dkt. 136-1, Ex. D at 128:22.  Based on this conflicting

4    testimony, the court finds that defendants cannot establish that Kelley O'Toole consented

5    to the search of GIYG, nor can plaintiffs establish that Kelley O'Toole withheld consent.

6        Regarding defendants' argument that the consent issue is "immaterial" because

7    GIYG was open to the public, the court finds two problems with this argument.  First, it

8    was raised for the first time in reply, depriving plaintiffs of an opportunity to respond.

9    Second, and more importantly, defendants appear to take plaintiffs' quote out of context,

10   choosing to quote only the words "open to the public," even though plaintiffs stated that

11   "GIYG was technically 'open to the public,' but kept locked for security."  Dkt. 158 at 16.

12   Defendants attempt to minimize the fact that "the O'Tooles tried to regulate what and

13   when members of the public could enter with the security door lock," but the fact that the

14   door was locked serves to distinguish this case from the cases cited by defendants,

15   which hold that "when a business owner opens his business to the public, he or she has

16   no reasonable expectation of privacy in the area; accordingly, the government is free to

17   conduct a search of the items in plain view during normal business hours." See, e.g.,

18   People v. Potter, 128 Cal.App.4th 611, 617 (2005) (internal citations omitted).  By locking

19   the door, the O'Tooles demonstrated their reasonable expectation of privacy, and

20   defendants cite no authority for the proposition that a business owner who uses a locked

21   door to control entry by the public still has "no reasonable expectation of privacy in the

22   area."  Thus, the court finds that there is a triable issue of fact as to whether the "open to

23   the public" exception applied to the entry of GIYG, and thus, the court does not find it

24   "immaterial" that Kelley O'Toole testified that her keycard was taken without consent.

25   Stated another way, the court does not find that defendants have shown, for purposes of

26   this motion, that Kelley O'Toole consented to the entry of GIYG, or that GIYG was open

27   to the public.

28        Defendants then offer yet another alternative to justify their entry into GIYG –

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1    arguing that "how officers obtained the key to enter is further immaterial as the Antioch

2    defendants had the lawful right to enter (and could have broken down the front door) to

3    freeze the location pending the issuance of a search warrant."  Dkt. 163 at 9.

4    Defendants' support for "freezing" of the GIYG location comes from Segura v. U.S., 468

5    U.S. 796 (1984).  However, while Segura does allow officers to secure a location in order

6    to "prevent the destruction or removal of evidence while a search warrant is being

7    sought," defendants mischaracterize the Court's holding by describing Segura as

8    allowing them to "enter a premises and conduct a protective sweep pending the issuance

9    of a search warrant."  Dkt. 163 at 10.  A close reading of Segura shows that the Court

10   was careful to not lump together the officers' right to "enter a premises" versus their right

11   to "conduct a protective sweep."

12          Segura reached the Supreme Court after two individuals convicted of drug

13   trafficking appealed their conviction, arguing that the evidence against them was obtained

14   through a violation of their Fourth Amendment rights.  The facts of Segura are as follows:

15   officers received information that two individuals (Andres Segura and Luz Maria Colon)

16   were trafficking cocaine from their apartment.  Officers observed a meeting where Colon

17   and Segura delivered a package to two individuals, and after the meeting, officers

18   stopped the two individuals and discovered that the package contained cocaine.  The

19   arrestees agreed to cooperate with the police, and provided information regarding Segura

20   and Colon.  Based on that information, the officers went to Segura and Colon's

21   apartment, but were unable to secure a search warrant beforehand.  The officers

22   encountered and arrested Segura in the lobby of the apartment, and even though he did

23   not consent to the officers entering his apartment, they did so anyway.  After entering, the

24   officers found indicia of drug trafficking (i.e., a scale, small plastic bags, etc.) in plain

25   view, and arrested Colon based on that indicia.  At this point, officers still did not have a

26   search warrant, and in fact, would not obtain one until the next day.  Until the warrant was

27   issued, officers remained in the apartment.  When the warrant was finally executed,

28   officers found nearly three pounds of cocaine, $50,000 in cash, and records of narcotics

transactions.

Before trial, Segura and Colon moved to suppress the evidence taken from their apartment.  The district court granted the motion, finding that the officers' initial entry into the apartment was illegal, as there were no exigent circumstances justifying the entry, and thus all evidence subsequently found was "fruit" of the illegal search.  Although the district court found that the search warrant that ultimately issued was valid, it found that the evidence should nevertheless be suppressed, because absent the illegal entry, Colon might have arranged to have the evidence removed or destroyed.

On appeal, the Second Circuit affirmed the finding that the initial entry was illegal and that any evidence discovered in plain view at that time must be suppressed, but found that any evidence discovered after the issuance of the search warrant was still admissible.  On the basis of that later-discovered evidence, Segura and Colon were convicted, and their appeal of that conviction resulted in the cited Supreme Court opinion.

Notably, the Court started its analysis by stating that "[a]t the outset, it is important to focus on the narrow and precise question before us," noting that "the Court of Appeals agreed with the District Court that the initial warrantless entry and the limited security search were not justified by exigent circumstances and were therefore illegal."  468 U.S. at 804.  "No review of that aspect of the case was sought by the Government and no issue concerning items observed during the initial entry is before the Court."  Id.

The Court's distinction between the entry into the apartment and the "freezing" of the apartment proved critical to the resolution of the case.  First, the Court made clear that "the wiser course would have been" to avoid entering the apartment, and to instead "secure the premises from the outside by a stakeout."  468 U.S. at 811.  The Court then again acknowledged that "absent exigent circumstances, the entry may have constituted an illegal search."  Id.  However, because the entry's legality was not before the Court, it focused only on the "seizure" (i.e., the freezing) of the apartment, and held that "the initial entry – legal or not – does not affect the reasonableness of the seizure," because "both an internal securing and a perimeter stakeout interfere to the same extent with the

possessory interests of the owners." Id.

The Segura defendants argued that the Court's ruling would "heighten the possibility of illegal entries" by "holding that the illegal entry and securing of the premises from the inside do not themselves render the seizure any more unreasonable than had the agents staked out the apartment from the outside." 468 U.S. at 811. However, the Court disagreed, and explained its reasons for believing that there were still sufficient protections against illegal entries:

> In the first place, an entry in the absence of exigent circumstances is illegal. We are unwilling to believe that officers will routinely and purposely violate the law as a matter of course. Second, as a practical matter, officers who have probable cause and who are in the process of obtaining a warrant have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry. . . Third, officers who enter illegally will recognize that whatever evidence they discover as a direct result of the entry may be suppressed, as it was by the Court of Appeals in this case. Finally, if officers enter without exigent circumstances to justify the entry, they expose themselves to potential civil liability under 42 U.S.C. § 1983.

468 U.S. at 811-812.

This closer look at Segura shows that defendants are only half right when they claim that "officers are lawfully able to enter a premises and conduct a protective sweep pending the issuance of a search warrant." Dkt. 163 at 10. Officers may indeed, with probable cause, conduct a protective sweep while a search warrant is pending; however, probable cause is not sufficient to justify entry into a location. As the Segura Court stated, "officers who have probable cause and who are in the process of obtaining a warrant have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry." Of course, exigent circumstances is not the only justification for a warrantless entry – if officers have consent to enter, or if the premises is open to the public, officers may enter without violating the Fourth Amendment, and may then secure the location on the basis of probable cause. However, as explained above, there remain triable issues of fact surrounding the

United States District Court
Northern District of California

1   O'Tooles' alleged consent and the extent to which GIYG was open to the public.

2       In their motion, the Antioch defendants make no effort to argue that their entry was

3   justified by exigent circumstances.  However, in opposition to plaintiffs' motion for

4   summary judgment,  the Antioch defendants include a heading stating that "probable

5   cause and exigency justified the entry and freezing of GIYG," but do not explain the

6   source of the exigency.  At best, the Antioch defendants imply that the exigency was

7   created by Lee leaving the store to put a backpack in his car, but that occurred <u>after</u> the

8   entry, and thus could not have justified the entry itself.

9       In sum, the court finds that the Antioch defendants have not adequately

10  established that their entry was justified by either consent, the "open to the public"

11  exception, or exigent circumstances.  Thus, defendants are not entitled to summary

12  judgment on any of those bases.

13      Defendants offer the additional argument that they are entitled to qualified

14  immunity.  The defense of qualified immunity protects "government officials . . . from

15  liability for civil damages insofar as their conduct does not violate clearly established

16  statutory or constitutional rights of which a reasonable person would have known."

17  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The rule of qualified immunity "provides

18  ample protection to all but the plainly incompetent or those who knowingly violate the

19  law"; defendants can have a reasonable, but mistaken, belief about the facts or about

20  what the law requires in any given situation.  <u>Malley v. Briggs</u>, 475 U.S. 335, 342 (1986).

21  "Therefore, regardless of whether the constitutional violation occurred, the [official] should

22  prevail if the right asserted by the plaintiff was not 'clearly established' or the [official]

23  could have reasonably believed that his particular conduct was lawful."  <u>Romero v. Kitsap</u>

24  <u>County</u>, 931 F.2d 624, 627 (9th Cir. 1991).  Qualified immunity is particularly amenable to

25  summary judgment adjudication.  <u>Martin v. City of Oceanside</u>, 360 F.3d 1078, 1081 (9th

26  Cir. 2004).

27      A court considering a claim of qualified immunity must determine whether the

28  plaintiff has alleged the deprivation of an actual constitutional right and whether such right

United States District Court
Northern District of California

1    was clearly established such that it would be clear to a reasonable officer that his conduct

2    was unlawful in the situation he confronted.  See Pearson v. Callahan, 555 U.S. 225,

3    235-36 (2009) (overruling the sequence of the two-part test that required determination of

4    a deprivation first and then whether such right was clearly established, as required by

5    Saucier v. Katz, 533 U.S. 194 (2001)).  The court may exercise its discretion in deciding

6    which prong to address first, in light of the particular circumstances of each case.  Id.

7    (noting that while the Saucier sequence is often appropriate and beneficial, it is no longer

8    mandatory).

9         Regarding the first prong, the threshold question must be: Taken in the light most

10   favorable to the party asserting the injury, do the facts alleged show that the defendant's

11   conduct violated a constitutional right?  Saucier, 533 U.S. at 201; see Martin, 360 F.3d at

12   1082 (in performing the initial inquiry, court is obligated to accept plaintiff's facts as

13   alleged, but not necessarily his application of law to the facts; the issue is not whether a

14   claim is stated for a violation of plaintiff's constitutional rights, but rather whether the

15   defendants actually violated a constitutional right) (emphasis in original).  "If no

16   constitutional right would have been violated were the allegations established, there is no

17   necessity for further inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.

18        The inquiry of whether a constitutional right was clearly established must be

19   undertaken in light of the specific context of the case, not as a broad general proposition.

20   Saucier, 533 U.S. at 202.  The relevant, dispositive inquiry in determining whether a right

21   is clearly established is whether it would be clear to a reasonable defendant that his

22   conduct was unlawful in the situation he confronted.  Id.; see also Pearson, 555 U.S. at

23   243-44 (concluding that officers were entitled to qualified immunity because their conduct

24   was not clearly established as unconstitutional as the "consent-once-removed" doctrine,

25   upon which the officers relied, had been generally accepted by the lower courts even

26   though not yet ruled upon by their own federal circuit).  If the law did not put the

27   defendant on notice that his conduct would be clearly unlawful, summary judgment based

28   on qualified immunity is appropriate.  Saucier, 533 U.S. at 202.

United States District Court
Northern District of California

17

1    "If there are genuine issues of material fact in issue relating to the historical facts

2    of what the official knew or what he did, it is clear that these are questions of fact for the

3    jury to determine." Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099

4    (9th Cir. 1995).  If the essential facts are undisputed, or no reasonable juror could find

5    otherwise, however, then the question of qualified immunity is appropriately one for the

6    court. Id. at 1100 (citing Hunter v. Bryant, 502 U.S. 224, 227-28 (1991)).  Or the court

7    may grant qualified immunity by viewing all of the facts most favorably to plaintiff and

8    then finding that under those facts the defendants could reasonably believe they were not

9    violating the law. See, e.g., Marquez v. Gutierrez, 322 F.3d 689, 692-93 (9th Cir. 2003);

10   Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1051-53 (9th Cir. 2002).

11       On the first prong, the court does find that, taken in the light most favorable to the

12   plaintiffs, the facts alleged show that defendants' conduct violated a constitutional right.

13   In that light, the facts show that the Antioch defendants entered the locked door of GIYG

14   without consent and without exigent circumstances to justify the entry.  On the second

15   prong, the court finds that it would be clear to a reasonable defendant that entering a

16   locked location, without consent, and with no showing of exigent circumstances would be

17   unlawful.  The Antioch defendants argue on this motion that probable cause justified their

18   entry, and in fact, would have allowed them to break down the front door.  See Dkt. 163

19   at 9.  However, the court finds that it is clearly established that probable cause is

20   sufficient only to obtain a warrant, not to conduct a warrantless entry, and that something

21   more (such as consent or exigent circumstances) is needed to enter without a warrant.

22   Thus, the court finds that defendants have not demonstrated entitlement to qualified

23   immunity.

24       In sum, given the triable issues of fact regarding the constitutionality of the GIYG

25   search, and the failure to establish that qualified immunity bars any claims arising out of

26   that search, the court finds that defendants' motion for summary judgment must be

27   DENIED as to the first cause of action asserted by the O'Tooles and Lee.  However,

28   those same triable issues of fact also require that plaintiffs' motion for partial summary

United States District Court
Northern District of California

18

1    judgment be DENIED.

2          Even if the court were to put aside the issues surrounding the entry into GIYG, the

3    court also finds triable issues of fact regarding the existence of probable cause to "freeze"

4    the GIYG location.  In their motion, the Antioch defendants attempt to demonstrate the

5    existence of probable cause by pointing to the "lawful search of the FS location,

6    conversations with Denner and the O'Tooles, behavior of Sean and Lee, items

7    consensually searched from the Lee backpack, and other evidence and observations."

8    Dkt. 136 at 22.  However, as before, defendants have muddled the timeline.  In their own

9    statement of facts, defendants indicate that Lee's backpack was not searched until <u>after</u>

10   the GIYG location was frozen, and thus, any items found into the backpack cannot factor

11   into the probable cause analysis.  <u>See</u> Dkt. 136 at 9.

12         Also, defendants' reference to the "behavior of Sean" appears to refer to the fact

13   that Sean O'Toole denied the officers consent to search GIYG.  At the hearing, the court

14   walked through the facts that defendants relied upon for their probable cause

15   determination, and defendants' counsel identified the fact that Sean O'Toole denied

16   consent to a search of GIYG.  The court indicated that denial of consent cannot give rise

17   to probable cause, but defendants' counsel insisted that the officers considered it as a

18   factor in making their probable cause determination.

19         In short, by including these improper bases for probable cause as part of their

20   justification for freezing GIYG, the Antioch defendants have muddled the issue, and have

21   thus failed to adequately demonstrate that they had probable cause to freeze GIYG.

22   Thus, even if the entry into GIYG were justified, the court finds that summary judgment

23   on the first cause of action in defendants' favor would still not be warranted.  Though,

24   again, plaintiffs have also failed to meet their burden to show that the officers did <u>not</u>

25   have probable cause to freeze GIYG pending the issuance of a search warrant, so

26   summary judgment in their favor is equally unwarranted.

27         Given the disputed facts surrounding both the entry into GIYG and the freezing of

28   GIYG, the court does not reach the issue of whether the search of Lee's backpack was

United States District Court
Northern District of California

United States District Court
Northern District of California

1    constitutional, because that analysis is dependent on the constitutionality of the entry

2    and/or the freezing.

3         Moving on from the first cause of action, the second cause of action brought by

4    the O'Tooles and Lee is for conspiracy to violate section 1983.  As mentioned above,

5    because only Vincelet, Wisecarver, Aiello, Bergerhouse, Krenz, Koch, Bittner, Joannides,

6    Chalk, and Orman are alleged to have been involved in the GIYG search, the court will

7    consider this cause of action only as to those defendants.

8         In contrast to the first cause of action, this claim requires not only a constitutional

9    violation, but an agreement among the defendants to commit the violation.  See, e.g.,

10   Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir.

11   1999) ("To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate

12   the existence of an agreement or meeting of the minds to violate constitutional rights.").

13   Plaintiffs have not identified any evidence of an agreement among the defendants

14   involved with the GIYG search.  Thus, defendants' motion for summary judgment is

15   GRANTED as to the second cause of action brought by the O'Tooles and Lee, and

16   plaintiffs' motion for partial summary judgment is DENIED.

17        Before turning to the Monell claim, the court will first address the RICO claim (the

18   fourth cause of action), because it suffers from similar deficiencies as the second cause

19   of action.  In general, RICO makes it criminal to conduct an enterprise's affairs or obtain

20   benefits through a pattern of "racketeering activity," which is defined as behavior that

21   violates specific federal statutes or state laws that address specified topics and bear

22   specified penalties.  Rotella v. Wood, 528 U.S. 549, 552 (2000).  Section 1961 sets forth

23   the specific "predicate acts" that may constitute "racketeering activity" for a RICO

24   violation.  18 U.S.C. § 1961(1).  A "pattern" of racketeering activity requires "at least two

25   acts of racketeering activity."  18 U.S.C. § 1961(5).

26        The RICO statute includes a private right of action "by which '[a]ny person injured

27   in his business or property' by a RICO violation" may seek damages and the cost of the

28   suit.  Rotella, 528 U.S. at 552 (quoting 18 U.S.C. 1964(c)).  Thus, in order to state a claim

1   under RICO, a plaintiff must allege facts that establish a pattern of racketeering activity

2   based on a minimum of two predicate acts, a criminal enterprise in which the defendants

3   participated, and a causal relationship between the predicate acts and the harm suffered

4   by the plaintiff.  See 18 U.S.C. §§ 1961-68; Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479,

5   496-97 (1985).

6          The O'Tooles and Lee have failed to provide any evidence of a "pattern of

7   racketeering activity" involving the officers present at the GIYG search.  As will be

8   discussed further below, plaintiffs' evidence is limited to showing a pattern of racketeering

9   activity between Wielsch, Lombardi, and Butler, none of whom were present at the GIYG

10  search.  And as mentioned above, while the complaint does provide instances of alleged

11  racketeering activity, those instances involved Curtis and Foster, not the O'Tooles or Lee.

12  For those reasons, defendants' motion for summary judgment is GRANTED as to the

13  fourth cause of action brought by the O'Tooles and Lee.

14         Next, the O'Tooles and Lee assert a Monell claim against the City of Antioch and

15  Antioch police chief James Hyde.  And as mentioned above, the complaint is unclear as

16  to whether this claim is also asserted against the Antioch Police Department, but for

17  purposes of this motion, the court will assume that any Monell claim against the police

18  department is co-extensive with the Monell claim against the city.

19         Local governments are subject to liability under § 1983 where official policy or

20  custom causes a constitutional tort.  See Monell v. Dep't of Social Servs., 436 U.S. 658,

21  690 (1978).  To impose liability under § 1983 for a violation of constitutional rights, a

22  plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or

23  she was deprived, (2) that the municipality had a policy, (3) that this policy amounts to

24  deliberate indifference to the plaintiff's constitutional rights, and (4) that the policy is the

25  "moving force" behind the constitutional violation.  See Plumeau v. Schl. Dist. #40 County

26  of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997).

27         To survive summary judgment, a plaintiff must point to an express policy, practice,

28  or custom, or provide evidence showing an inference that such policy, practice or custom

United States District Court
Northern District of California

21

1   exists informally.  See Waggy v. Spokane County, 595 F.3d 707, 713 (9th Cir. 2010).  A

2   policy can be established if one of the following conditions are met:  (1) "the city

3   employee committed the alleged constitutional violations pursuant to the city's official

4   policy or custom," (2) the alleged conduct was "a deliberate choice" made by an

5   employee with final policymaking authority, or (3) an official with policymaking authority

6   delegated or ratified the conduct.  Fuller v. City of Oakland, 47 F.3d 1522, 1534 (9th Cir.

7   1995) (citations and quotations omitted).

8   Several key caveats apply to informal municipal policies or customs.  For instance,

9   proof of random acts or isolated incidents of unconstitutional action by a non-

10  policymaking employee are insufficient to establish the existence of  a municipal policy or

11  custom.  See McDade v. West, 223 F.3d 1135, 1142 (9th Cir. 2000).  However, a plaintiff

12  may prove the existence of a custom or informal policy with evidence of repeated

13  constitutional violations for which the errant municipal officials were not discharged or

14  reprimanded.  See Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir. 1992).

15  A local government may be liable for constitutional violations resulting from its

16  failure to supervise, monitor or train its employees, but only where the failure amounts to

17  deliberate indifference to the rights of the people with whom the local government comes

18  into contact.  See City of Canton v. Harris, 489 U.S. 378, 388 (1989); Long v. County of

19  Los Angeles, 442 F.3d 1178, 1188-89 (9th Cir. 2006).  Evidence of a city's failure to train

20  a single officer, however, is insufficient to establish a municipality's deliberate policy.

21  Blankenhorn v. City of Orange, 485 F.3d 463, 484-85 (9th Cir. 2007).

22  In the context of a city's alleged indifference to its police officers violating the

23  constitutional rights of its residents, providing evidence of past complaints is generally

24  insufficient to establish a policy or custom of indifference.  See, e.g., Maestrini v. City and

25  County of San Francisco, 2009 WL 814510 at *11 (N.D. Cal. March 26, 2009) ("a list of

26  prior complaints against an officer, without more, is insufficient to create a triable issue of

27  fact regarding a municipality's policy of inadequately investigating or disciplining its

28  officers"); Hocking v. City of Roseville, 2008 WL 1808250 at *5 (E.D. Cal. April 22, 2008)

United States District Court
Northern District of California

1    (holding that custom not established where plaintiff didn't produce evidence showing that

2    previous complaints should have resulted in discipline).

3         In their motion, the Monell defendants first argue that plaintiffs' Monell claim must

4    fail because they have failed to establish an underlying constitutional violation.  However,

5    as stated above, the court finds that plaintiffs have raised a triable issue of fact as to the

6    constitutionality of the GIYG search.

7         Defendants then argue that plaintiffs have failed to identify a policy, practice, or

8    custom that caused the alleged violation.  Defendants argue that plaintiffs must identify

9    either an "express policy" or a practice that is "so permanent and well-settled as to

10   constitute a 'custom or usage' with the force of law."  Monell, 436 U.S. at 691.

11   Defendants argue that plaintiffs have failed to provide evidence of either a formal or an

12   informal policy, and point to an interrogatory response by plaintiffs where, after being

13   asked for all facts that support the Monell claim, they responded with the following

14   boilerplate allegations:

15            Defendants Antioch and Hyde, by and through their supervisory officials
              and employees, have been given notice on repeated occasions of a pattern
16            of ongoing constitutional violations and practices by defendant police
              officers herein and other Antioch police officers, constituting inter alia, illegal
17            detentions, searches, and seizures of citizens, the submission of search
              warrant affidavits not based upon probable cause, submission of overly
18            broad search warrants, and submission of false affidavits.  Despite said
              notice, defendants City and Hyde, have demonstrated deliberate
19            indifference to this pattern and practice of constitutional violations by failing
              to take necessary, appropriate, or adequate measures to prevent the
20            continued perpetuation of said pattern of conduct by Antioch police officers
              and other outside agencies.  This lack of adequate supervisorial response
21            by defendants City and Hyde, demonstrates ratification of the defendant
              officers' unconstitutional acts, as well as the existence of an informal
22            custom or policy which tolerates and promotes the continued conduct
              including illegal detentions, searches, and seizures of the citizens of
23            Antioch, the submission of search warrant affidavits not based upon
              probable cause, submission of overly broad search warrants, and
24            submission of false affidavits against the citizens by Antioch police officers
              and other outside agencies.
25

26

27   Dkt. 136-6, Ex. BB.

28

United States District Court
Northern District of California

1    Defendants argue that these "general allegations of wrongdoing" are not sufficient

2  for Monell liability.

3    Defendants then argue that plaintiffs cannot rely on a "failure to train" theory, nor

4  can plaintiffs show any ratification by defendant Hyde.

5    In their opposition, plaintiffs are not clear as to whether they are challenging an

6  express policy, an informal practice, and/or a failure to train, and instead make scattered

7  allegations regarding the Monell defendants' alleged wrongdoing.  For instance, in their

8  introduction, plaintiffs first assert that the City of Antioch "has no policies governing

9  search and seizure," and "no policy to ensure that officers are properly trained on the

10  Fourth Amendment," but then argues that "item 10 of policy no. 5" is "facially

11  unconstitutional."  Dkt. 169 at 1.  The court will start by looking at the express policies

12  challenged by plaintiffs, and then will address the "practice or custom" and "failure to

13  train" allegations.

14    In their opposition, plaintiffs point to two policies of the City of Antioch:  (1) policy

15  5, section 10, which prohibits "[c]omission of any act which is violation of any law, statute,

16  ordinance or procedure, unless it is in the performance of duty and is reasonable and

17  prudent for the situation," and (2) policy 52, which provides in relevant part that "[i]t is the

18  policy of the Antioch Police Department that sworn personnel shall digitally record

19  contacts with citizens that are controversial or hostile in nature, to include, but not limited

20  to; traffic stops, detentions, consensual contacts with suspects, witnesses, victims; and

21  while handling any call that is prone to police/citizen hostility such as domestic violence,

22  miscellaneous disturbances, DUI, etc.," and which states that the recordings "may be

23  subject to discovery and disclosure."  Dkt. 170, Exs. 2, 3.

24    On policy 5, item 10, plaintiffs' argument appears to be that officers may

25  "interpret[] item 10 to permit Fourth Amendment violations for 'good reason.'"  Dkt. 169 at

26  4.  However, the fact that an officer may misinterpret the policy does not imply that the

27  policy itself leads to the violation.  As applied to this case, plaintiffs cannot show that item

28  10 "amounts to deliberate indifference to the plaintiffs' constitutional rights," nor that it is

United States District Court
Northern District of California

1   the "moving force" behind the alleged constitutional violations.  Accordingly, the court

2   finds that item 10 cannot give rise to <u>Monell</u> liability.

3           As to policy 52, plaintiffs appear to take issue with the fact that it "explicitly

4   admonishes officers that if they record the recordings may be discoverable which

5   suggests a culture of subterfuge in Antioch law enforcement."  Dkt. 169 at 12.  Again,

6   plaintiffs' argument appears to rely on speculation, and nothing about the policy itself

7   "suggests a culture of subterfuge."  While plaintiffs may rely on other evidence to suggest

8   such a culture, their attempt to use the policy to do so fails.  Plaintiffs have not shown that

9   policy 52 amounts to deliberate indifference to the plaintiffs' constitutional rights, or that

10  the policy is the "moving force" behind the constitutional violation.

11          Thus, the court moves to plaintiffs' allegations that defendants had a "practice and

12  custom" of conducting illegal searches and seizures.  For support, plaintiffs point to the

13  "10 or more lawsuits" filed against defendant Hyde and/or the City of Antioch as

14  "evidence that [they] were on notice of repeated constitutional violations and did nothing

15  to implement policy on enforcement of the 4th Amendment."  Dkt. 169 at 15.  However,

16  defendants correctly point out that the mere fact that lawsuits were filed does not

17  establish that a pattern of constitutional violations actually occurred.  As mentioned

18  above, "providing evidence of past complaints is generally insufficient to establish a

19  policy or custom of indifference."  Plaintiffs provide no information regarding the merits of

20  any of the lawsuits filed against the City of Antioch, although they do point out that a

21  lawsuit involving the City of Davis (of which defendant Hyde previously served as police

22  chief) where a Fourth Amendment violation was found.  The court finds that a lawsuit

23  against the City of Davis cannot serve to put the defendants in this case on notice of

24  violations by City of Antioch police officers.  Overall, the court finds that plaintiffs have

25  failed to provide "evidence of repeated constitutional violations for which the errant

26  municipal officials were not discharged or reprimanded."

27          Next, the court will address the "failure to train" theory.  On this issue, the court

28  finds there to be a lack of evidence from both sides.  Defendants rely on individual

United States District Court
Northern District of California

1   training logs which contain only a one-line entry for each training subject, and thus fail to

2   provide any information about the substance of the training.  Plaintiffs, for their part, also

3   fail to provide any specifics on why the training was inadequate, offering only conclusory

4   assertions that the training was inadequate.  Given that the plaintiffs bear the burden of

5   proving the inadequacy of training at trial, the court finds that the lack of evidence from

6   both sides requires that summary judgment be granted in defendants' favor.  Plaintiffs

7   essentially seek to shift the burden to defendants, asking them to prove that the training

8   was adequate, rather than providing the court with specific details regarding why the

9   current training was inadequate.

10      Moreover, as stated above, plaintiffs must show that the failure to train amounted

11  to "deliberate indifference to the rights of the people with whom the local government

12  comes into contact."  However, as mentioned above, plaintiffs' attempted showing of

13  deliberate indifference consists only of "evidence of past complaints," rather than

14  "evidence showing that previous complaints should have resulted in discipline."

15      Plaintiffs also make a number of arguments directed toward only defendant Hyde,

16  arguing that he was "on notice of repeated lawsuits against his officers and the City of

17  Antioch for illegal search and seizure," that he "failed to supervise the training of his

18  officers," that "he signed a policy which gave officers discretion to record citizens with the

19  proviso that the recordings could be discoverable."  These allegations are substantively

20  similar to the allegations described above, the only difference being that plaintiffs are

21  attributing them to defendant Hyde individually, rather than to the City as a whole.  The

22  court finds plaintiffs' allegations to be similarly inadequate.

23      Thus, for the foregoing reasons, the court GRANTS the Monell defendants' motion

24  for summary judgment as to the third cause of action asserted by the O'Tooles and Lee.

25      Finally, the last of the claims arising out of the GIYG search are the fifth and sixth

26  causes of action for malicious and retaliatory prosecution, asserted by plaintiff Lee

27  against defendants Vincelet and Aiello.  The complaint alleges that defendant Vincelet

28  signed a felony complaint against Lee "in furtherance of the ongoing conspiracy" to

1   violate his civil rights and in retaliation for the filing of this civil lawsuit. TAC, ¶ 52. The

2   complaint further alleges that defendants Vincelet and Aiello falsely testified against him

3   both at the preliminary hearing and at trial. TAC, ¶¶ 54-55. The opposition brief similarly

4   contends that "Vincelet and Aiello knowingly withheld information with the intent to harm

5   him and knowingly supplied false information to the district attorney and the magistrate in

6   the search warrant," and that "Vincelet filed an affidavit and statement of probable cause

7   omitting that before the warrant was signed, Antioch officers conducted a protective

8   sweep of GIYG and found no marijuana cultivation." Dkt. 158 at 22.

9       In order to establish a malicious prosecution claim, plaintiff must show that the

10   defendants prosecuted him with malice and without probable cause, and that they did so

11   for the purpose of denying him a specific constitutional right. <u>Freeman v. City of Santa</u>

12   <u>Ana</u>, 68 F.3d 1180, 1189 (9th Cir. 1995).

13       In the complaint, plaintiff asserts that defendants acted with the purpose of

14   denying (1) his right to be free from unreasonable seizures, (2) his right to be free from

15   retaliation for exercise of rights, speech, and expression, and (3) his right to be free from

16   malicious prosecution. The first of these rights was not affected by the prosecution itself.

17   While the search/seizure of Lee may have been unconstitutional (as discussed above),

18   there is no evidence to support the assertion that, by prosecuting Lee, defendants were

19   somehow depriving him of his right to be free of unreasonable seizures. The third listed

20   right – the right to be free from malicious prosecution – strikes the court as an exercise in

21   circular reasoning. Essentially, Lee argues that, by maliciously prosecuting Lee,

22   defendants violated his right to be free from malicious prosecution. If this theory were

23   sufficient, then any criminal defendant could allege that his prosecution was effected for

24   the purpose of denying a constitutional right.

25       The strongest of these theories is the second one, that defendants sought to

26   interfere with Lee's right to free speech by filing charges in response to Lee's filing of a

27   civil lawsuit against the Antioch defendants. Indeed, the timing of Lee's charges does

28   appear to be suspicious at best, occurring 15 months after the GIYG search and less

27

1   than one month after the filing of this lawsuit.  However, plaintiff does not offer any

2   support for the proposition that timing alone can support a finding that defendants acted

3   "with the purpose" of denying him a constitutional right.  Moreover, even if plaintiff could

4   show that defendants acted with such a purpose, he would still need to show that

5   defendants acted with malice and without probable cause.

6          Regarding probable cause, defendants point out that Lee was held over for trial

7   following his preliminary hearing, and indeed, "a decision by a judge or magistrate to hold

8   a defendant to answer after a preliminary hearing constitutes prima facie – but not

9   conclusive – evidence of probable cause."  Awabdy v. City of Adelanto, 368 F.3d 1062,

10   1067 (9th Cir. 2004).  In order to rebut the presumption that his prosecution was based

11   on probable cause, plaintiff could show that "the criminal prosecution was induced by

12   fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in

13   bad faith."  Id.  Plaintiff has not met this standard.  At best, plaintiff has provided evidence

14   that the GIYG search itself was improperly conducted, but has not shown the type of bad

15   faith conduct set forth in Awabdy, and instead, relies on a presumption of bad faith.

16          Moreover, even if plaintiff were able to overcome the presumption of probable

17   cause stemming from the magistrate's decision, he would still need to overcome the

18   rebuttable presumption that the prosecutor's judgment was independent from the

19   defendants' alleged bad faith.  The Ninth Circuit has identified a "well-settled principle"

20   that the "filing of a criminal complaint immunizes investigating officers . . . from damages

21   suffered thereafter because it is presumed that the prosecutor filing the complaint

22   exercised independent judgment in determining that probable cause for an accused's

23   arrest exists at that time."  Harper v. City of Los Angeles, 533 F.3d 1010, 1027 (9th Cir.

24   2008) (citing Smiddy v. Varney, 665 F.2d 261, 266 (9th Cir.1981)).  To rebut the

25   presumption, a plaintiff must show that "the district attorney was pressured or caused by

26   the investigating officers to act contrary to his independent judgment."  Smiddy at 266.

27   Such evidence must be substantial, and cannot consist merely of a plaintiff's own

28   account of events.  Newman v. County of Orange, 457 F.3d 991, 994-95 (9th Cir. 2006).

1     Not only does plaintiff fail to provide any evidence that the district attorney was

2 pressured or influenced to act contrary to his independent judgment, but defendants

3 included with their motion a declaration from the district attorney, affirmatively stating that

4 he made the independent decision to prosecute Lee without any influence from any

5 Antioch police officers.  Dkt. 136-4, Ex. V.  Plaintiff claims in his opposition that he has

6 "rebutted the presumption of prosecutorial independence by showing that Vincelet and

7 Aiello knowingly withheld information with the intent to harm him and knowingly supplied

8 false information to the district attorney," but these allegations do not overcome the

9 prosecutor's own contemporaneous declaration, which states that he made an

10 independent decision to prosecute Lee.

11     Finally, to the extent that plaintiff's malicious prosecution claim is based on the

12 testimony provided by Aiello and Vincelet, the court finds that defendants are entitled to

13 absolute immunity for their testimony.  See Holt v. Castaneda, 832 F.2d 123, 127 (9th

14 Cir. 1987).  Plaintiff argues that Holt is based on the Supreme Court's opinion in Briscoe

15 v. LaHue, 460 U.S. 325 (1983), and should thus be similarly limited to cases where the

16 criminal defendant was actually convicted.  However, nothing in Holt indicates that the

17 court meant to limit its holding to cases involving convicted defendants, and in fact, its

18 explanation of the rationale behind the "absolute immunity" rule provides no basis for

19 drawing such a line.  The Holt court explained that the purpose behind the rule was to

20 encourage candid testimony from witnesses, because "a witness who knows he may be

21 subjected to costly and time-consuming civil litigation for offering testimony that he is

22 unable to substantiate may consciously or otherwise shade his testimony in such a way

23 as to limit potential liability."  Holt at 125.  If such "shading" were to occur, "the paths

24 which lead to the ascertainment of truth may be obstructed."  Id. (citing Briscoe at 333-

25 34).  The court finds this rationale to apply equally to instances where the criminal

26 defendant is not ultimately convicted, and thus, finds that defendants' testimony at Lee's

27 trial cannot give rise to a malicious prosecution claim.

28     Thus, for the foregoing reasons, the court finds that plaintiff Lee has failed to raise

29

1    a triable issue of fact on his malicious prosecution claim, and thus, defendants' motion for

2    summary judgment is GRANTED.

3            Plaintiff Lee's sixth cause of action, for retaliatory prosecution, suffers from similar

4    defects.  To establish a retaliatory prosecution claim, a plaintiff must show that his

5    prosecution was made without probable cause and with a retaliatory motive.  Hartman v.

6    Moore, 547 U.S, 250, 265 (2006).  Hartman also noted the difficulty of proving causation

7    where the retaliatory-prosecution defendant is not the person who ultimately made the

8    decision to prosecute.  As the Court put it, "[e]vidence of an inspector's animus does not

9    necessarily show that the inspector induced the action of a prosecutor who would not

10   have pressed charges otherwise."  Id. at 263.  As a result of this break in the chain of

11   causation, "[s]ome sort of allegation, then, is needed both to bridge the gap between the

12   nonprosecuting government agent's motive and the prosecutor's action, and to address

13   the presumption of prosecutorial regularity."  Id.

14           As mentioned above, not only has plaintiff failed to make any allegation to "bridge

15   the gap" between defendants' motive and the prosecutor's action, but the prosecutor has

16   affirmatively stated that he was not influenced by defendants and instead made his own

17   independent decision.  For those reasons, the court finds that plaintiff Lee has failed to

18   raise a triable issue of fact on his retaliatory prosecution claim, and thus, defendants'

19   motion for summary judgment is GRANTED.

20           2.      Claims asserted by Curtis and Foster

21           As before, due to the lack of clarity in the complaint, the court's first step is to

22   discern which claims are asserted by Curtis and Foster, and which defendants they are

23   asserted against.  And as mentioned above, all five plaintiffs are mentioned under the

24   heading for the first four causes of action, so for now, the court will assume that both

25   Curtis and Foster intend to assert each of those claims.  Neither Curtis nor Foster is

26   mentioned as part of the malicious/retaliatory prosecution claims.

27           As discussed above, the complaint is not clear in identifying against whom each

28   claim is asserted.   On the first cause of action, for deprivation of rights under section

United States District Court
Northern District of California

1    1983, the complaint makes blanket references to "defendant officers."  On the second

2    cause of action, for conspiracy to violate civil rights under section 1983, plaintiffs similarly

3    rely on blanket references to "defendant officers," though they also allege that the officers

4    did so under the supervision of defendant Leonard Orman.  For these two claims, the

5    court will err on the side of over-inclusion and consider all individual defendants to be part

6    of these claims.  However, to the extent that certain officers are not alleged to have

7    participated in the searches of Curtis and/or Foster, the court will grant summary

8    judgment as to those defendants.

9         On the third cause of action, the complaint refers to defendants City of Antioch and

10   James Hyde.  And finally, on the fourth cause of action, for violation of the civil RICO

11   statute, the complaint names the following defendants:  Wielsch, Lombardi, Vincelet,

12   Wisecarver, Aiello, Bergerhouse, Koch, Bittner, and Butler.

13        Thus, based on the allegations of the complaint, it appears that the following

14   claims are asserted by Curtis and Foster:  (1) a section 1983 claim asserted against all

15   individual defendants; (2) a claim for conspiracy to violate section 1983 asserted against

16   all individual defendants; (3) a Monell claim asserted against the City of Antioch, the

17   Antioch Police Department, and Chief James Hyde; (4) a civil RICO claim asserted

18   against Wielsch, Lombardi, Vincelet, Wisecarver, Aiello, Bergerhouse, Koch, Bittner, and

19   Butler.

20        The court's next step is to determine which defendants were actually involved in

21   the searches of Curtis and/or Foster.  To the extent that any individual defendants were

22   not involved in those searches, no claim can be asserted against them by Curtis or

23   Foster.

24        As discussed in the background section of this order, the Curtis/Foster claims

25   arise out of three searches:  (1) a June 28, 2007 search of the home of Curtis' boyfriend,

26   Kevin Ackerman, (2) a search either in August 2008 or fall 2008 of Ackerman's home,

27   and (3) a January 5, 2010 search of Foster's home.  In the complaint, plaintiffs allege that

28   Vincelet, Wielsch, Lombardi, and Wisecarver were present for the first search, that the

31

1   same four defendants were present for the second search, and that Wielsch and Vincelet

2   were present for the third search.  Plaintiffs' opposition brief also alleges that there was a

3   scheme between Wielsch, Wisecarver, Lombardi, and Butler, so the court will include

4   Butler as part of the claims asserted by Curtis and Foster.  However, none of the other

5   defendants (namely, Hyde, Aiello, Bergerhouse, Koch, Bittner, Orman, Krenz, Joannides,

6   or Chalk) are mentioned at all in the context of the Curtis/Foster searches.  Thus, to the

7   extent that complaint asserts the first, second, or fourth causes of action against them,

8   defendants' motion for summary judgment is GRANTED.

9       Now having parsed the complaint and the parties' papers, the court is left with the

10  following claims asserted by Curtis/Foster:  (1) a section 1983 claim asserted against

11  Vincelet, Wielsch, Lombardi, Wisecarver, and Butler; (2) a claim for conspiracy to violate

12  section 1983 asserted against Vincelet, Wielsch, Lombardi, Wisecarver, and Butler; (3) a

13  Monell claim asserted against the City of Antioch, the Antioch Police Department, and

14  Chief James Hyde; (4) a civil RICO claim asserted against Wielsch, Lombardi, Vincelet,

15  Wisecarver, and Butler.  The court will now turn to the merits of these claims.

16      On the first cause of action, defendants' first argument is that any claims arising

17  out of the 2007 and 2008 searches are time-barred.  The statute of limitations for § 1983

18  claims is based on the state's statute of limitations for personal injury claims, which, in

19  California, is two years.  See Wallace v. Kato, 549 U.S. 384, 387 (2007); Cal. Civ. Proc.

20  Code § 335.1.  This suit was filed on March 29, 2011, more than two years after the 2007

21  and 2008 searches.

22      Plaintiffs' only response is to argue that "in cases regarding claims of criminal

23  conspiracy, the statute of limitations begins to run after the commission of the last overt

24  act."  Dkt. 158 at 17.  However, the first cause of action is not a conspiracy claim, it is a

25  claim for deprivation of rights under § 1983, and stems from each of the individual

26  searches.  While the "last overt act" doctrine may be relevant to the second and fourth

27  causes of action, plaintiffs have provided no authority for applying it to the first cause of

28  action.  Thus, the court finds that, in the context of the first cause of action, any claims

United States District Court
Northern District of California

1  arising out of the 2007 and 2008 searches are indeed time-barred.  As a result, the first

2  cause of action can be based only on the 2010 search of Foster's home, during which

3  Curtis was also present.

4       Defendants do not actually challenge the merits of the 2010 search, and instead

5  offer only one argument:  that plaintiffs' claims are barred by the rule set forth in Heck v.

6  Humphrey, 512 U.S. 477 (1994).  Heck holds that "the district court must consider

7  whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his

8  conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff

9  can demonstrate that the conviction or sentence has been invalidated.  But if the district

10  court determines that the plaintiff's action, even if successful, will not demonstrate the

11  invalidity of any outstanding criminal judgment against the plaintiff, the action should be

12  allowed to proceed."  512 U.S. 477, 487 (1994).  In short, "the relevant question is

13  whether success in a subsequent § 1983 suit would 'necessarily imply' or 'demonstrate'

14  the invalidity of the earlier conviction or sentence."  Id.

15       The Ninth Circuit addressed the scope of the Heck bar in Smith v. City of Hemet,

16  and recognized that there may be different "phases" of conduct during an arrest, and that

17  the arrestee may challenge conduct that occurred before or after his arrest without

18  necessarily implicating the Heck bar.  394 F.3d 689 (9th Cir. 2005).

19       Specifically, in City of Hemet, the police responded to a domestic violence report

20  at the home of the plaintiff, Thomas Smith.  When an officer arrived, Smith came to the

21  door, but was confrontational with the officer, using expletives, refusing to take his hands

22  out of his pockets, and daring the officer to "come to him."  The officer insisted that Smith

23  remove his hands from his pockets to show that he had no weapons, but Smith continued

24  to refuse, and even went back inside his house.

25       Smith came back outside and complied with an instruction to remove his hands

26  from his pockets, but refused to comply with an instruction to put his hands on his head

27  and approach the officer, and instead continued to insist that the officer enter the home

28  with him.

United States District Court
Northern District of California

1    Another officer then arrived on the scene with a canine unit, and the officers again

2    told Smith to turn around and place his hands on his head.  Smith refused, so the officers

3    warned him that the canine could be sent to subdue him and might bite.  At this time, one

4    of the officers used pepper spray on Smith.  Smith attempted to re-enter the house, but

5    his wife had locked the door.  The officers moved in to subdue him, and also ordered the

6    canine to attack, resulting in a bite on Smith's arm.

7    Smith filed suit claiming excessive force, based on the pepper spray and the dog

8    bite.  Defendants moved for summary judgment based on <u>Heck</u>, arguing that Smith had

9    pled guilty to willfully resisting, delaying, or obstructing a police officer, and that success

10   in Smith's civil suit would undermine the conviction.  Defendants emphasized that an

11   element of the crime was the resistance, delay, or obstruction of a police officer <u>in the</u>

12   <u>lawful exercise of his duties</u>, so to the extent that Smith claimed excessive force, it would

13   undermine the "lawful exercise" element of the conviction.  The district court agreed, and

14   granted summary judgment.

15   However, the Ninth Circuit noted that the "lawful exercise of his duties" element

16   was limited to "the time of the arrest."  The court then explained that Smith had engaged

17   in at least three acts of resisting, delaying, or obstructing before any use of force, and

18   then continued to resist, delay, or obstruct after the use of force.  However, Smith's guilty

19   plea was not specific as to <u>which</u> conduct formed the basis of the conviction.  The court

20   found this lack of specificity crucial to the <u>Heck</u> analysis, and articulated the distinction as

21   follows:

22       It is, thus, clear that if Smith pled guilty [] based on his behavior <u>after</u> the
         officers came onto the porch, during the course of the arrest, his suit would
23       be barred by <u>Heck</u>.  In such case, a successful § 1983 action by Smith
         would necessarily mean that the officers had used excessive force to
24       subdue him and were therefore acting unlawfully at the time his arrest was
         effected. In that circumstance, Smith's conviction under § 148(a)(1) would
25       have been wrongful and a successful § 1983 suit by him would demonstrate
         its invalidity. . . .Under <u>Heck</u>, Smith would be allowed to bring a § 1983
26       action, however, if the use of excessive force occurred <u>subsequent</u> to the
         conduct on which his conviction was based.
27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

394 F.3d at 697-98 (emphasis in original).

    Ultimately, the City of Hemet court held that "[b]ecause on the record before us we cannot determine that the actions that underlay Smith's conviction upon his plea of guilty occurred at the time of or during the course of his unlawful arrest, Smith's success in the present action would not necessarily impugn his conviction." Id. at 699.

    As a subsequent Ninth Circuit decision described City of Hemet, "an allegation of excessive force by a police officer would not be barred by Heck if it were distinct temporally or spatially from the factual basis for the person's conviction." Beets v. County of Los Angeles, 669 F.3d 1038, 1042 (9th Cir. 2012).

    This case presents a somewhat similar situation. The complaint challenges multiple types of conduct — in addition to alleging that the search warrant served upon Foster's home was "illegally obtained" (which would implicate the Heck bar, as it would undermine the basis for the arrest), it also alleges that Wielsch and Vincelet took property that was not listed on the search warrant return, such as cash, jewelry, sunglasses, sports memorabilia, and a cell phone. TAC, ¶ 68, 69, 71, 74. Based on City of Hemet, the allegations regarding the search warrant would undermine the convictions, but the allegations regarding property theft would not, as plaintiffs' conviction related only to possessing and cultivating marijuana. In other words, plaintiffs can simultaneously argue that the conviction was valid, but that their property was unlawfully seized as part of the arrest. To accept defendants' argument would be to grant carte blanche for officers to improperly seize whatever they want during an otherwise-valid arrest. If plaintiffs were challenging the basis for the search/arrest warrant itself, then they would be challenging the underlying conviction, but to the extent that they challenge only conduct that occurred after the search warrant issued and while it was being executed, the Heck bar is not implicated.

    Because defendants do not make any other argument for summary judgment relating to the 2010 search (including any qualified immunity defense relevant to this search), defendants' motion is DENIED as to the first cause of action, to the extent that it

arises out of the 2010 search/seizure.  However, as mentioned above, summary

judgment is GRANTED to the extent that the first cause of action arises out of the time-

barred 2007 and 2008 searches, and GRANTED to the extent that the first cause of

action is asserted against defendants with no connection to the search (Hyde, Aiello,

Bergerhouse, Koch, Bittner, Orman, Krenz, Joannides, and Chalk).

The court now moves to the second cause of action, for conspiracy to violate civil

rights under § 1983, asserted against Vincelet, Wielsch, Lombardi, Wisecarver, and

Butler.  As mentioned above, Wielsch has filed his own motion for summary judgment,

while Wisecarver and Vincelet seek summary judgment via the Antioch defendants'

motion.  Neither Butler nor Lombardi have moved for summary judgment.

The complaint alleges the existence of an ongoing conspiracy between Wielsch,

Lombardi, and Butler to obtain drugs from illegal searches and seizures and to sell those

drugs for personal gain.  See, e.g., TAC, ¶¶ 75-83.  Because Wielsch is the only one of

these three to move for summary judgment, the court will reference his motion in

addressing these allegations.

Wielsch does not dispute that he, Butler, and Lombardi were involved in criminal

activity of the type alleged by plaintiffs, and admits that the three have each been

convicted of various criminal acts related to the scheme.  Wielsch also concedes that he,

Butler, and Lombardi were all involved with at least the January 2007 search.  Wielsch

was present in his capacity as CCCNET's commander, Lombardi was a CCCNET agent

and present for the search, and Butler submitted a declaration in support of the warrant.

Dkt. 141 at 3.  Wielsch is less clear about his involvement in the two other searches.

In general, it appears that Wielsch's main argument is that the criminal acts

perpetrated by him, Butler, and Lombardi were "limited to specific, discrete conduct,

including only:  two instances involving the theft of narcotics subject to a destruction

order, four incidents where he used his authority as an officer to steal cash from known

prostitutes, and one instance where he participated in a fake sting operation to scare a

subject out of the narcotics business."  Dkt. 141 at 6.  In essence, he argues that he may

36

have stolen drugs from police searches, but he did not do so with respect to Curtis or Foster.  The court finds this argument to be unavailing.  Plaintiffs have provided evidence of an admitted conspiracy among Wielsch, Butler, and Lombardi, and have alleged that the searches at issue in this case were conducted in furtherance of the conspiracy. Defendants' response is to argue that there was indeed a conspiracy, but that it did not involve these searches.  However, this argument is undermined by the deposition testimony of the officer assigned to investigate Lombardi.  The investigating officer testified that "Lombardi said it was Wielsch who stole the watch [taken from Curtis] and provided it to him."  Dkt. 136-3, Ex. J at 103:17-19, 104:14-18.  As mentioned above, the watch was found in Lombardi's possession, and was identified by Curtis as the one taken during the search. The court also finds it significant that the allegations in this case involve the same type of acts that defendants have admitted to in other instances.

Accordingly, the court finds that there is a triable issue of fact as to whether the searches/seizures of Curtis and Foster were part of the conspiracy between Wielsch, Butler, and Lombardi.  And because the last of these searches occurred within the limitations period, the "last overt act" doctrine allows the claim to be based on all three searches.  As a result, Wielsch's motion for summary judgment as to the second cause of action asserted by Curtis and Foster is DENIED.  And as mentioned above, neither Butler nor Lombardi have moved for summary judgment.

However, to the extent that plaintiffs attempt to show an agreement beyond Wielsch, Butler, and Lombardi, they lack evidence of any such agreement.  In their opposition to the Antioch defendants'  (i.e., Wisecarver and Vincelet) motion, plaintiffs include a section titled "relationship between defendants Wielsch, Butler, and Wisecarver." Dkt. 158 at 5.  Much of this section involves allegations of a conspiracy between Wielsch, Butler, and Lombardi – which, as discussed above, is conceded by the defendants.  The alleged contacts with Wisecarver are far thinner.  Plaintiffs allege, in their opposition to the Antioch defendants' motion, that Wisecarver used to work with Butler and Wielsch at the Antioch Police Department, that Wisecarver "ran into Lombardi

at a minor league baseball game," that Wisecarver "worked 5-10 cases with Wielsch,"

that Wisecarver "had contact with Lombardi in the form of text messages," that

Wisecarver and Butler were "friends for years" and "both were bodybuilders who worked

out a lot," and that "Wielsch saw Wisecarver and Vincelet at countywide narcotics

meetings."  Dkt. 158 at 6-7.  None of these allegations come close to establishing that

Wisecarver was involved in any agreement to commit constitutional violations.  Plaintiffs'

allegations against Vincelet are similar.  Thus, the court finds that plaintiffs have failed to

raise a triable issue of fact that any agreement to violate civil rights involved either

Wisecarver or Vincelet, and as a result, the Antioch defendants' motion for summary

judgment as to the second cause of action asserted by Curtis and Foster against

Wisecarver and Vincelet is GRANTED.

Moving to the fourth cause of action, the court finds that a similar distinction must

be drawn between Wielsch, Butler, and Lombardi on one hand, and Wisecarver and

Vincelet on the other.

Regarding Wielsch, Butler, and Lombardi, Wielsch concedes that they engaged in

criminal acts of the type alleged by plaintiffs.  However, he argues that their acts did not

constitute an "enterprise," and "at most, Wielsch, Butler, and Lombardi formed sporadic

associations to accomplish specific, criminal goals."  Dkt. 141 at 14.  The court finds no

basis for this distinction.  The formation of an association to accomplish specific, criminal

goals is the definition of a RICO enterprise, and the fact that the criminal acts were

"sporadic" does not affect the analysis.  The RICO statute does not require constant,

uninterrupted criminal activity.

Wielsch also argues that the complaint alleges a broader enterprise, involving

members of the Antioch police department, and that any attempt to "re-define the

complaint" to allege an enterprise involving only Wielsch, Butler, and Lombardi should be

rejected.  However, the court finds no basis for this "all or nothing" requirement that

Wielsch seeks to impose.  Plaintiffs asserted a RICO claim against a large number of

defendants, and it appears to be the case that there are insufficient allegations against all

38

1    but three of those defendants.  The court sees no reason to grant summary judgment on

2    a potentially viable claim against certain defendants just because the claim is not viable

3    as to other defendants.

4         Wielsch then argues that plaintiffs have failed to establish a nexus between the

5    enterprise and the alleged racketeering activity.  Specifically, Wielsch argues that the

6    agreement between him, Butler, and Lombardi did not come into existence until 2009,

7    after the first two searches involving Curtis.  Thus, the first two searches could not be part

8    of an "enterprise" that did not yet exist.  However, as with the conspiracy claim, the court

9    finds that Wielsch's own testimony regarding the lack of an enterprise is insufficient to

10   warrant summary judgment.  All of the alleged searches involve the same type of conduct

11   that Wielsch admits that he engaged in with Lombardi and Butler – improperly seizing

12   items and selling them for personal gain.  Moreover, as mentioned above, Lombardi was

13   found with a watch taken from the second search involving Curtis (at Ackerman's home),

14   and claimed that it was given to him by Wielsch.  If Wielsch gave the watch to Lombardi

15   after taking it during the search, that certainly lends support to plaintiffs' claim that the

16   search and seizure were part of the enterprise.  While Wielsch may be correct that the

17   specific searches alleged in this case were not actually part of the enterprise, the court

18   finds that to be a question for the jury, and not one suitable for resolution on summary

19   judgment.

20        Next, Wielsch alleges that "even if such an enterprise did exist, the search of the

21   Ackerman residence was not <u>enabled</u> by the existence of the enterprise," because the

22   search was enabled by a valid search warrant.  However, even if the search itself was not

23   part of the enterprise, plaintiffs allege that items were improperly seized as part of the

24   enterprise.

25        Wielsch then raises two other challenges to the RICO claim – that plaintiffs cannot

26   establish the required predicate acts, and that plaintiffs cannot establish an injury.

27   Starting with the "predicate acts" argument, the complaint alleges that the June 2007 and

28   January 2010 searches involved violations of 18 U.S.C. § 1512(b)(2)(B), which applies to

United States District Court
Northern District of California

39

"[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . cause or induce any person to . . . alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding."  Wielsch claims that plaintiffs cannot establish that he ever used "intimidation, threats, or corruption" to persuade any other person to "alter, destroy, or mutilate" an object for the purpose of obstructing an official proceeding.  At best, plaintiffs allege that Wielsch himself falsified the Notice of Asset Forfeiture, which "does not involve any attempt to persuade someone else to falsify a document."  However, Wielsch overlooks the "engages in misleading conduct" portion of the statute, which is much broader than using "intimidation, threats, or corrupt persuasion" against another person.  Wielsch also overlooks the fact that defendant Butler provided a declaration in support of the warrant, and thus could have engaged in "misleading conduct toward another person, with intent" to "cause or induce any person" to "conceal" the seized objects.  Even if Wielsch himself did not commit that predicate act, it is enough that he was part of an enterprise, and that a member of the enterprise committed a predicate act.  Accordingly, combined with the unchallenged allegation that the second search constituted a "robbery," the court finds that plaintiffs have sufficiently raised a triable issue of fact as to whether the enterprise engaged in the two required predicate acts.

Turning to the "injury" requirement, Wielsch first focuses on the 2007 search, during which Curtis claimed that $20,000 was taken from her.  Wielsch argues that "Curtis cannot establish that the alleged predicate act directly led to her injuries," because, even if the money was taken, "she did not lose the $20,000 because of the falsification or destruction of any records," and instead, "the seizure of money in 2007 occurred as the direct result of a lawful search and the confiscation of assets pursuant to California forfeiture law."  However, Curtis challenges that the money was properly seized, and more importantly, argues that the money should have been listed on the notice of asset forfeiture, so that it could have been returned after an official proceeding.

40

1   Wielsch characterizes any expectation of getting the money back as "optimistic at best,"

2   but in the absence of any evidence that Curtis would not have received the money back,

3   the court finds Curtis' allegations sufficient to constitute an "injury."

4          As to the 2008 search, Wielsch argues that the watch that Curtis claims to have

5   been taken actually belonged to Ackerman, not to Curtis.  However, the complaint also

6   alleges that a necklace, an earring set, and "several thousand dollars" were also taken,

7   which is sufficient to constitute an "injury."

8          In sum, as to Wielsch, Butler, and Lombardi, the court finds that plaintiffs have

9   raised a triable issue of fact regarding a pattern of racketeering activity based on a

10  minimum of two predicate acts, a criminal enterprise in which the defendants participated,

11  and a causal relationship between the predicate acts and the harm suffered by the

12  plaintiffs.  Accordingly, Wielsch's motion for summary judgment as to the fourth cause of

13  action asserted by Curtis and Foster is DENIED.  To the extent that the fourth cause of

14  action is asserted against any defendant other than Wielsch, Butler, and Lombardi,

15  defendants' motion is GRANTED.

16         Moving back to the third cause of action, as mentioned above, the complaint

17  appears to indicate that this claim is asserted by all five plaintiffs, including Curtis and

18  Foster.  However, in their opposition to defendants' motion for summary judgment,

19  plaintiffs confined their arguments to the O'Tooles and Lee, and did not mention Curtis or

20  Foster at all.  Thus, it appears that plaintiffs do not intend to assert this claim on behalf of

21  Curtis and Foster; however, even if they did, the claim would fail for the same reasons set

22  forth earlier in this order.  Accordingly, defendants' motion for summary judgment is

23  GRANTED as to the third cause of action to the extent asserted by Curtis and Foster.

24                                        **CONCLUSION**

25         For the reasons stated, plaintiffs' motion for summary judgment is DENIED; the

26  Antioch defendants' motion for summary judgment is GRANTED in part and DENIED in

27  part; Wielsch's motion for summary judgment is GRANTED in part and DENIED in part;

28  and the Monell defendants' motion for summary judgment is GRANTED.

1   The court is left with two distinct sets of claims.  With respect to the GIYG search,

2   there remains one cause of action (for deprivation of rights under § 1983) asserted by the

3   O'Tooles and Lee against defendants Vincelet, Wisecarver, Aiello, Bergerhouse, Krenz,

4   Koch, Bittner, Joannides, Chalk, and Orman.  With respect to the searches of Curtis and

5   Foster, there remain three causes of action:  (1) deprivation of rights under § 1983, based

6   on only the 2010 search, and asserted against Vincelet, Wisecarver, Wielsch, Butler, and

7   Lombardi; (2) conspiracy to violate rights under § 1983, asserted against Wielsch, Butler,

8   and Lombardi; and (3) a civil RICO violation asserted against Wielsch, Butler, and

9   Lombardi.  Because the two sets of claims involve no overlapping allegations, the court is

10  inclined to sever them for trial, but it is not clear that severance is practicable given the

11  custodial nature of several of the parties.  The court will discuss this further with the

12  parties at the pretrial conference before a final determination is made.

13      **IT IS SO ORDERED.**

14  Dated:  September 1, 2015

15  _____

16  PHYLLIS J. HAMILTON
    United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

42